**CITY OF SOUTH PASADENA; et al., Plaintiffs,**

v.

**Rodney E. SLATER; et al., Defendants.**

**No. CV98–6996DDP(MANx).**

United States District Court, C.D. California.

July 19, 1999.

Joseph W. Pannone, Kane Ballmer & Berkman, Los Angeles, CA, Donald P. Johnson, H. Francisco Leal, Beltran & Medina, Los Angeles, CA, Antonio Rossmann, Roger B. Moore, Antonio Rossman Law Offices, San Francisco, CA, for plaintiff City of South Pasadena.

Steven M. Friedman, Heller Ehrman White & McAuliffe, Los Angeles, CA, Antonio Rossmann, Roger B. Moore, Antonio Rossman Law Offices, San Francisco, CA, Elizabeth S. Merritt, National Trust for Historic Preservation, Washington, DC, Steven Russell Tekosky, Johnson & Tekosky, Los Angeles, CA, for plaintiff Nat. Trust for Historic Preservation.

Jan Chatten-Brown, Jan Chatten-Brown Law Offices, Los Angeles, CA, Antonio Rossmann, Roger B. Moore, Antonio Rossman Law Offices, San Francisco, CA, for Plaintiffs Sierra Club, Los Angeles Conservancy, Pasedena Heritage, South Pasedena Preservation Foundation.

Antonio Rossmann, Roger B. Moore, Antonio Rossman Law Offices, San Francisco, CA, Carolyn Douthat, Carolyn Douthat Law Offices, Oakland, CA, for Plaintiff Cal. Preservation Foundation.

David V. Rose, Wright Robinson Osthimer & Tatum , Los Angeles, CA, Antonio Rossmann, Roger B. Moore, Antonio Rossman Law Offices, San Francisco, CA, for Plaintiff South Pasedena Unified School Dist.

Leon W. Weidman, Monica L. Miller, Asst.U.S.Attty., Office of U.S. Attorney, Civil Div., Los Angeles, CA, for Defendants Rodney E. Slater, Kenneth R. Wykle, Fed. Highway Admin.

Glenn B. Mueller, Department of Transporation, Legal Division, San Diego, CA, for Defendants James W. Van Loben Sels, Cal. Transp. Comm'n.

Glenn B. Mueller, Jeffrey A. Joseph, Department of Transporation, Legal Division, San Diego, CA, for Defendant Cal. Dept. of Transp.

Jeffrey A. Joseph, Department of Transporation, Legal Division, San Diego, CA, for Defendant Jose Jose Medina.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

PREGERSON, District Judge.

The plaintiffs' motion for preliminary injunction came before the Court for oral argument on November 17, 1998 and July 1, 1999. After reviewing and considering the materials submitted by the parties and hearing oral argument, the Court grants in part and denies in part the motion for preliminary injunction.

### BACKGROUND

The plaintiffs are the City of South Pasadena ("South Pasadena"), the National Trust for Historic Preservation, the Sierra Club, the California Preservation Foundation, the Los Angeles Conservancy, the Pasadena Heritage, the South Pasadena Preservation Foundation, and the South Pasadena Unified School District. The defendants are the United States Secretary of Transportation Rodney E. Slater, the Federal Highway Administrator Kenneth R. Wykle, the Federal Highway Administration ("FHWA"), the Director of the California Department of Transportation Jose Medina,[1] and the California Department of Transportation ("Caltrans").

The plaintiffs seek to enjoin the extension of the 710 Freeway through Los Angeles, South Pasadena, and Pasadena.

The 710 Freeway begins in Long Beach and continues northward intersecting the 10 Freeway. It ends shortly thereafter as it leaves Alhambra to enter Los Angeles. It then resumes about a quarter of a mile south of the 210 Freeway in Pasadena where it terminates upon reaching the 210 Freeway. The defendants seek to extend the 710 Freeway a distance of 4.5 miles in order to connect both segments. This extension is known as the "710 Freeway Project."

The project has a long history. In 1964, Caltrans proposed what is known as the "Meridian Route" for the 710 Freeway Project. This route closely followed Meridian Avenue. In January 1973, the City of South Pasadena filed suit in this Court against the current defendants' predecessors because they had approved the 710 Freeway Project without preparing an environmental impact statement ("EIS"). The Honorable Judge E. Avery Crary issued an injunction mandating that the defendants prepare an EIS. Caltrans abandoned the Meridian Route between 1977 and 1981, focusing instead on a proposal to extend the 110 Freeway 1.5 miles to the north to connect with the 210 Freeway. The FHWA, however, rejected the 110 Freeway extension.

In 1982, Caltrans revived the Meridian Route and secured state approval in 1984. In 1983 and 1984 the Advisory Council on

---

1. Jose Medina was substituted for James W. Van Loben Sels pursuant to Federal Rule of Civil Procedure 25(d)(1).

Historic Preservation ("Advisory Council"), a federal agency, suggested that because of the impact on historical resources, the FHWA should adopt a "no-build" alternative. This was rejected. In 1986, Caltrans circulated a draft EIS proposing a modified route, the "Meridian Variation." In April 1991, South Pasadena requested that the defendants evaluate a "low-build" alternative. On March 2, 1992, Caltrans released the final EIS ("FEIS") for the Meridian Variation.

In 1992, after the FEIS was signed, the FHWA convened the "Enhancement and Mitigation Advisory Committee"[2] to address the concerns parties had with the Meridian Variation and minimize harms associated with the freeway extension.

In January 1993, the Advisory Council referred the 710 Freeway Project controversy to the President's Council on Environmental Quality ("CEQ").[3] CEQ determined that the FHWA needed to conduct additional evaluations of the project's impacts on historical resources and that the FHWA needed to develop and analyze a low-build alternative.

In September 1993, South Pasadena developed a low-build alternative to the 710 Freeway Project known as the "Multi-Mode Low–Build Alternative" ("MMLB").

In November 1995, the Keeper of the National Register of Historic Places[4] determined that the Short Line Villa Tract Historic District in El Sereno was eligible for the National Register. The Meridian Variation traversed this district. In response, Caltrans announced that it would shift the proposed route to avoid the district by 15 feet. This was known as the Berkshire Shift.

In December 1995, the Department of the Interior ("DOI") withdrew its concurrence to the project.[5] The DOI stated that a supplemental EIS ("SEIS") was appropriate and necessary before the final decision was made. The defendants have not produced an SEIS.

In 1996, Caltrans studied the MMLB in a report entitled "State Route 710: A Model Evaluation of the City of South Pasadena's Multi-Mode Low Build Proposal." The report concluded that the MMLB was unsatisfactory because it would not meet the project's purpose and need.

In late 1997, Caltrans and the federal defendants modified the freeway route. This route is known as the "Depressed Meridian Variation Alternative Reduced

2. The "Enhancement and Mitigation Advisory Committee" is a committee established by the defendants after approval of the FEIS. Its purpose was to bring Caltrans, the FHWA, interested special interest organizations, and cities in the Corridor (*see infra* footnote 9) which will be affected by the 710 Freeway Project together to find ways to minimize the impact of the project on the environment and historic resources. All of the cities in the Corridor participated in the committee; however, South Pasadena and the Sierra Club abandoned their roles in the committee due to irreconcilable differences in the goals of the committee. The committee produced a report entitled "Route 710 Meridian Variation Enhancement and Mitigation Advisory Committee Final Report" in June 1993.

3. The Council on Environmental Quality is comprised of three members appointed by the President who advise the President on environmental issues. The members must "analyze and interpret environmental trends and information of all kinds; . . . appraise programs and activities of the Federal Government . . .; . . . be conscious of and responsive to the scientific, economic, social, esthetic, and cultural needs and interests of the Nation; and . . . formulate and recommend national policies to promote the improvement of the quality of the environment." 42 U.S.C. § 4342.

4. The Keeper of the National Register of Historic Places is the individual responsible for determining which resources will be included on the National Register.

5. In 1983 and 1988 the DOI wrote letters to the FHWA stating that it concurred with the FHWA's analysis of the 710 Freeway Project under Section 4(f). (AR 28:83–0680; 41:88–0341.) The DOI, however, withdrew its concurrence stating that a supplemental EIS was necessary for this project and that the FHWA did not comply with Section 4(f). (AR 92:95–3475–95–3476.)

with Shift Design Variation," which is the subject of this dispute.

In March 1998, the Environmental Protection Agency ("EPA") and the Advisory Council announced their objections to the route. They asserted that the defendants should conduct an SEIS and should "honestly" consider a low-build alternative.

On April 13, 1998, the Secretary of Transportation, Rodney Slater, authorized the issuance of a federal Record of Decision ("ROD") approving the project. The ROD is the final administrative decision which represents that the government has complied with all statutory requirements and allows the project to be built.

The ROD places limits on the defendants, imposes conditions on the use of federal funds, and requires the defendants to conduct an SEIS and certain feasibility studies. The ROD modified the final route by adding one additional cut-and-cover tunnel [6] in the El Sereno neighborhood of Los Angeles. The ROD provided that if this tunnel is found to be infeasible then the ROD will be null and void. The ROD is binding on the federal defendants, but not on the California defendants. At oral argument, the attorney for the California defendants stated that the prior Caltrans director was committed to the ROD's terms. However, the California defendants were unable to represent that the commitment would continue given the election of a new administration.

The defendants submitted the full administrative record on May 10, 1999.[7]

The plaintiffs seek a preliminary injunction preventing future planning and monetary expenditures, and imposing certain requirements on the defendants. The plaintiffs claim that the defendants violated three federal statutes in developing the 710 Freeway Project: Section 4(f) of the Department of Transportation Act, the National Environmental Policy Act, and the Clean Air Act.

## DISCUSSION

### I. Legal standard for preliminary injunctions

 Within the Ninth Circuit a court may issue a preliminary injunction if the moving party meets one of two alternative tests. *See International Jensen, Inc. v. Metrosound U.S.A.,* 4 F.3d 819, 822 (9th Cir.1993). In the first test the moving party must demonstrate: "(1) the moving party will suffer irreparable injury if the relief is denied; (2) the moving party will probably prevail on the merits; (3) the balance of potential harm favors the moving party; and, depending on the nature of the case, (4) the public interest favors granting relief." *Id.* Alternatively, the moving party may demonstrate either "(1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted; or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor." *Id.* These standards "are not separate tests, but the outer reaches of a single continuum." *Id.*

### II. Whether the defendants complied with Section 4(f) of the Transportation Act

#### A. *Introduction and Standard of Review*

The issue here is whether the Secretary of Transportation ("the Secretary") com-

---

6. In building a cut-and-cover tunnel, the defendants will remove and store houses located on the site of the proposed tunnel. A large ditch will then be dug in which the freeway will be built. After construction the ditch and the freeway will be covered, creating a tunnel. The homes will then be replaced above the freeway on top of the tunnel.

7. The federal administrative record is over 50,000 pages long, is divided into 135 volumes, and contains documents dating from September 1961 thru October 1998. Citations to the administrative record will include both the volume and page number of the specific document. Where the citation is to the Record of Decision or a report, the citation will include a parenthetical stating to which document the citation refers.

plied with Section 4(f) of the Department of Transportation Act ("DOTA"), 49 U.S.C. § 303(c).[8]

The purpose of Section 4(f) is to protect the natural beauty and availability of parks and other environmental and historic resources. 49 U.S.C. § 303(a); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on other unrelated grounds, Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (discussing purposes of Section 4(f)). Section 4(f) states that "the Secretary 'shall not approve any program or project' that requires the use of any [Section 4(f) resource] 'unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such [resources].'" *Overton Park*, 401 U.S. at 411, 91 S.Ct. 814, *quoting* 23 U.S.C. § 138; 49 U.S.C. § 1653(f) (now codified at 49 U.S.C. § 303).

Section 4(f) is "a plain and explicit bar to the use of federal funds for construction of highways [which use Section 4(f) resources]—only the most unusual situations are exempted." *Id.* The Supreme Court has defined "no feasible alternative" to mean that "the Secretary [of Transportation] must find that as a matter of sound engineering it would not be feasible to build the highway along any other route." *Id.* The Supreme Court has defined "no

prudent alternative" to mean that the Secretary must "find[ ] that alternative routes present unique problems." *Id.* at 412, 91 S.Ct. 814.

The Ninth Circuit explained *Overton Park's* definition of a "feasible and prudent alternative" by stating that Section 4(f) resources "may be 'used' for highway purposes only if 'there [are] truly unusual factors present in [the] case,' if 'feasible alternative routes involve uniquely difficult problems,' or if 'the cost or community disruption resulting from alternative routes [reach] extraordinary magnitudes.'" *Stop H–3 Ass'n v. Dole*, 740 F.2d 1442, 1449 (9th Cir.1984), *quoting Overton Park*, 401 U.S. at 413, 416, 91 S.Ct. 814.

This Court is called upon to review the propriety of the Secretary's decision to approve a ROD calling for the use of Section 4(f) resources. This Court must affirm the Secretary's decision unless the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1)(A); *Stop H–3*, 740 F.2d at 1449. Pursuant to the Administrative Procedure Act the Court is required to consider whether:

1. The Secretary acted within the scope of his authority....

2. The Secretary properly construed his authority to approve the use of [Section 4(f) resources] as limited to

---

8. Section 4(f) of DOTA states:

(a) It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites.

(b) The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States, in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of lands crossed by transportation activities or facilities.

(c) The Secretary may approve a transportation program or project (other than any

project for a park road or parkway under section 204 of title 23) requiring the use of publicly owned land of a park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if—

(1) there is no prudent and feasible alternative to using that land; and

(2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

49 U.S.C. § 303 (1994).

situations where none of the alternatives to such use are feasible and prudent.

3. The Secretary could have reasonably believed that in the case under review there are no feasible and prudent alternatives.

4. The Secretary's decision was based on a consideration of the relevant factors.

5. The Secretary made a clear error of judgment.

6. The Secretary's action followed the necessary procedural requirements.

*Stop H–3*, 740 F.2d at 1449. Additionally, although "the Secretary's decisions are entitled to a presumption of regularity, that presumption does not 'shield his action[s] from a thorough, probing, in-depth review.'" *Id.*, *quoting Overton Park*, 401 U.S. at 415, 91 S.Ct. 814. The Court must also review the full administrative record. *Id.* at 1450.

### B. *Whether the defendants complied with Section 4(f)*

The parties disagree on the number and nature of Section 4(f) resources affected by the 710 Freeway Project. (*See infra* Part

II–B–3.) The defendants claim that there are 27 Section 4(f) resources in the Corridor.[9] The plaintiffs claim that there are several hundred historic resources in the Corridor.

The plaintiffs contend that the defendants have committed four violations of Section 4(f). First, the plaintiffs argue that the defendants failed to properly analyze the MMLB as an alternative to the 710 Freeway Project. Second, the plaintiffs argue that the defendants failed to properly consider whether the 710 Freeway Project will constructively use Section 4(f) resources. Third, the plaintiffs argue that the defendants did not include certain sites of state or local historic significance as being Section 4(f) resources. The plaintiffs argue that the defendants omitted these sites pursuant to a regulation that conflicts with Section 4(f). Fourth, the plaintiffs argue that the defendants failed to cure the objections of the EPA, the DOI, and the Advisory Council.

### 1. *Whether the defendants failed to properly analyze the MMLB*

As discussed earlier, South Pasadena developed an alternative transportation plan for the Corridor known as the

9. The Court uses the term "Corridor" to include the areas through which the 710 Freeway Project will pass—i.e. the western part of the San Gabriel Valley including the cities of Alhambra, Los Angeles, South Pasadena and Pasadena. The Court uses the term "Footprint" to refer to the actual path the proposed 710 Freeway Project takes through the Corridor.

The "Final Revised Section 4(f) Evaluation for the Route 710 Freeway" prepared by Caltrans and the FHWA in April 1998 identifies the Section 4(f) resources in the Corridor as 24 historic sites and three parks. The historic sites are: Grokowsy House, 816 Bonita Drive, South Pasadena; Wynyate House, 851 Lyndon Street, South Pasadena; Joy House, 921 Monterey Road, South Pasadena; Pierce House, 911 Monterey Road, South Pasadena; South of Mission District, South Pasadena; Arroyo Secco Parkway (Pasadena Freeway); Buena Vista District, South Pasadena; Prospect Circle District, South Pasadena; Thompson House, 220 Orange Grove Avenue, South Pasadena; Riggins House, 919 Columbia

Street, South Pasadena; Pasadena Avenue District, Pasadena and South Pasadena; South Pasadena Historic Business District, South Pasadena; Markham Place District, Pasadena; Short Line Villa Tract Historic District, El Sereno; Conaway–Penrose House, 5618 Berkshire Drive, El Sereno; Louise and Ruth Smith House, 5626 Berkshire Drive, El Sereno; William Jacobson House, 5636 Berkshire Drive, El Sereno; Ezra Scattergood House, 4515 Berkshire Avenue, El Sereno; Bellmar Court, 909–915 Summit Drive, South Pasadena; Otake/Nambu House, 857 Bank Street, South Pasadena; East Wynyate House, 909 Lyndon Avenue, South Pasadena; Warren D. Clark House, 930 Oliver Street, South Pasadena; Whitney Smith House, 209 Beacon Avenue, South Pasadena; and Mabel Packard House, 2031 Berkshire Avenue, South Pasadena. The three parks are the South Pasadena High School playing fields, South Pasadena; Orange Grove Park, 815 Mission Street, South Pasadena; and Singer Park, Pasadena.

MMLB.[10] Caltrans rejected the MMLB in a report entitled "State Route 710: A model evaluation of the City of South Pasadena's Multi–Mode Low Build Proposal" ("Caltrans MMLB Report"). Caltrans rejected the MMLB because it would use Section 4(f) resources and would not meet the 710 Freeway Project's purpose and need.[11]

The plaintiffs argue that the defendants failed to properly evaluate the MMLB and that they relied on impermissible and bi-

ased criteria which was designed to hold that the MMLB would not meet the project's purpose and need. *See* 40 C.F.R. § 1502.14 (stating EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives").

The plaintiffs point to statements made by the EPA in a letter to the FHWA's regional administrator. The EPA noted that "[i]t is unrealistic to evaluate a non highway (Low Build) alternative against a set of highway oriented criteria and elimi-

10. The MMLB describes the problems in the Corridor as: congested streets, congested freeways, congestion in cities affected by the 710 Freeway gap, regional access for people and goods, local circulation problems, safety issues (accidents and fatalities), air quality issues, total number of vehicle miles traveled, growth management concern, overall quality of travel, cost effectiveness of project and alternatives, and business environment issues. The MMLB proposes actions to address these problems without building a freeway. These include: completing Phase I of the Blue Line, extending the Blue Line, improving Metro-

link, adopting transit feeder busses, creating activity center circulators, creating a Fremont transit corridor, creating an electric trolley system, extending the 710 Freeway to Mission Road, creating what is known as the "Low Build Connector"—a streamlined connection between Fremont Boulevard and Fair Oaks Avenue, establishing northern traffic diversions and southern traffic diffusion, establishing arterial street traffic management, employing residential street traffic calming, redesigning Valley Boulevard, Fremont Avenue and Fair Oaks Avenue, and creating the Figueroa Extended Multi–Mode Corridor.

11. Caltrans rejected the MMLB based on a comparison of the performance of the Build Alternative and the MMLB in meeting the project's purpose and need. The following table illustrates this comparison:

| Transportation issue | Build Alternative Resolves Issue? | Low Build Proposal Resolves Issue? |
| --- | --- | --- |
| Reduce primary street congestion | YES | NO, increases |
| Reduce local street congestion | YES | NO, increases |
| Improved mobility and accessibility | YES | NO |
| Complete the freeway network | YES | NO |
| Complete HOV (carpool lane) network | YES | NO |
| Promote carpool & van pool formation | YES | NO, decreases |
| Promote transit ridership | MAYBE | NO, decreases |
| Reduce drive alone car trips | MAYBE | NO, increases |
| Reduce accident and fatality rates | YES | NO |
| Improve air quality | YES | NO |

(AR 103:96–4285 (Caltrans MMLB Report).)

nate it because it doesn't show a significant benefit for highway trips." (Administrative Record ("AR") 128:98–985.) The EPA stated it was "concerned that Caltrans and the FHWA did not find merit in proposing modifications to South Pasadena's proposal that would establish what both agencies could consider a feasible alternative that meets the Purpose and Need of relieving congestion and providing transportation improvements." (AR 128:98–985.) Finally, the EPA noted that the defendants "apparently never . . . attempt[ed] to develop other transportation segments, or undertake changes in the local infrastructure, modifying the original South Pasadena recommendations." (AR 128:98–985.)

The plaintiffs contend that the EPA's comments support a finding that Caltrans's analysis of the MMLB is flawed for three reasons. First, the Caltrans MMLB Report used criteria "slanted" in favor of building a freeway. Second, the MMLB substantially meets the transportation needs within the Corridor. Third, the Caltrans MMLB Report is based on invalid assumptions designed to discredit the MMLB and favor the 710 Freeway Project.

The defendants assert that the EPA and the DOI are not the agencies responsible for making transportation decisions and that the defendants are obligated to seriously consider their comments, but the defendants need not adopt them. Further, the defendants assert that they properly evaluated the MMLB and rejected it because it would use Section 4(f) resources and would not meet the project's purpose and need.

 a. *The use of Section 4(f) resources*
*and whether the MMLB is*
*feasible and prudent*

 The defendants rejected the MMLB, in part, because it, like the 710 Freeway Project, would also use Section 4(f) resources. The MMLB will require building a new on-ramp for the 110 Freeway at Fair Oaks Boulevard. The 110 Freeway (Pasadena Freeway) is a Section

4(f) resource. The defendants argue that they may reject the MMLB because both the MMLB ·and the 710 Freeway Project will use Section 4(f) resources.

The defendants are incorrect. The appropriate inquiry is to consider the extent to which each alternative uses Section 4(f) resources. *Druid Hills Civic Ass'n, Inc. v. Federal Highway Admin.*, 772 F.2d 700, 716 (11th Cir.1985). The *Druid Hills* court stated:

> Section 4(f)(2) imposes the duty to utilize all possible planning to minimize harm to parks and historic sites before the Secretary can approve a route using Section 4(f) property. Relocation of the highway through another portion of the Section 4(f) area or through other Section 4(f) properties must be considered as a means of minimizing harm. . . . [S]ection 4(f)(2) requires a simple balancing process which totals the harm caused by each alternate route to Section 4(f) areas and selects the option which does the least harm. The only relevant factor in making a determination whether an alternative route minimizes harm is the quantum of harm to the park or historic site caused by the alternative. Considerations that might make the route imprudent, e.g., failure to satisfy the project's purpose, are simply not relevant to this determination. If the route does not minimize harm, it need not be selected. The Secretary is free to choose among alternatives which cause substantially equal damage to parks or historic sites.
>
> . . .[T]he Secretary does not have to accept an alternate route which causes less harm to parks and historic sites. Rather, the court construed Section 4(f)(2) to mean that the route must also be feasible and prudent. Thus, a route that does minimize harm can still be rejected if it is infeasible or imprudent. The determination whether the route is infeasible or imprudent is based on factors other than the route's impact on Section 4(f) areas.

*Id.* (internal citations omitted). The critical question is whether the MMLB is feasible and prudent. *Stop H–3*, 740 F.2d at 1447. If a feasible and prudent alternative minimizes the use of Section 4(f) resources then that alternative must be chosen. *Druid Hills*, 772 F.2d at 716; *Stop H–3*, 740 F.2d at 1447.

The Ninth Circuit has defined "feasible" to mean "that the alternative [here, the MMLB] must be able to be built as a matter of sound engineering." *Id.* at 1449 n. 11. The Ninth Circuit has stated that alternatives are imprudent only where " 'there [are] truly unusual factors present in [the] case,' if 'feasible alternative routes involve uniquely difficult problems,' or if 'the cost or community disruption resulting from alternative routes [reach] extraordinary magnitudes.' " *Id.* at 1449, *quoting Overton Park*, 401 U.S. at 413, 91 S.Ct. 814.

In short, there are three key inquiries concerning the defendants' analysis of the MMLB. First, does the MMLB use Section 4(f) · resources. Second, does the MMLB minimize the use of Section 4(f) resources. Third, is the MMLB feasible and prudent.

i. *Whether the MMLB uses Section 4(f) resources and whether the MMLB minimizes the use of Section 4(f) resources*

■ The defendants argue that the MMLB would use a portion of the historic 110 Freeway by adding a northbound on-ramp at Fair Oaks Boulevard. The plaintiffs argue that placing this on-ramp is not a use because the on-ramp will not adversely affect the 110 Freeway's historic qualities. The plaintiffs cite to several federal regulations holding that certain minor changes to historic transportation facilities do not constitute the use of Section

4(f) resources. *See, e.g.,* 23 C.F.R. §§ 771.135(f), (p)(5)(i).[12]

To come within this regulation, the plaintiffs must show that the on-ramp is either a "restoration, rehabilitation, or maintenance" of a transportation facility and that the on-ramp would not affect the 110 Freeway's eligibility under Section 4(f). The defendants argue that the on-ramp will constitute a use because adding the on-ramp is not a restoration, rehabilitation, or maintenance of the freeway. The Court agrees with the defendants. Adding this on-ramp does not appear to fall within the plain meaning of "restoration, rehabilitation, or maintenance." Therefore, the Court finds that the MMLB does use a Section 4(f) resource.

■ The second question is whether the MMLB uses fewer Section 4(f) resources than the 710 Freeway Project. The plaintiffs have made a strong showing that the MMLB will significantly minimize the use of Section 4(f) resources. The MMLB uses one Section 4(f) resource. The defendants concede that the 710 Freeway Project would use substantially more Section 4(f) resources, including the 110 Freeway. (AR 129:98–1794–98–1798 (Final 4(f) Evaluation).) Following the quantitative analysis mandated by *Druid Hills*, the Court concludes that the plaintiffs have shown a strong likelihood of proving that the MMLB minimizes harm to Section 4(f) resources.

ii. *Whether the MMLB is feasible and prudent*

The last question is whether the MMLB is feasible and prudent. The ROD stated that the MMLB was not feasible and prudent because:

> toric qualities of the facility that caused it to be on or eligible for the National Register, and (2) The [State Historic Preservation Officer] and the Advisory Council on Historic Preservation ... have been consulted and have not objected to the Administration finding...

**12.** 23 C.F.R. § 771.135(f) states:

> The Administration may determine that section 4(f) requirements do not apply to restoration, rehabilitation, or maintenance of transportation facilities that are on or eligible for the National Register when: (1) Such work will not adversely affect the his-

1. This plan would not provide through north-south freeway service;

2. Regionally, this plan would not efficiently connect two east-west interstate routes;

3. This plan would not provide an HOV [High Occupancy Vehicle—Carpool lane] link within the existing HOV network;

4. This plan has not been included on the [Southern California Association of Governments ("SCAG")] 1994 Regional Mobility Element; [13]

5. This plan would result in the affected corridor cities continuing to experience impaired pedestrian and vehicle access, risk of accidents, noise pollution, impaired economic development, and poor local traffic circulation; and

6. The LACMTA [14] has projected a ridership of only 64,000 passenger-trips per day by the year 2010 for the Blue Line LRT [15] extension, with only a fraction of this ridership being drawn from the freeway. The Blue Line LRT extension is expected to be completed by the year 2001.[16]

(AR 129:98–1887(ROD).)

None of these reasons states that the MMLB cannot "be built as a matter of sound engineering." *Stop H–3*, 740 F.2d at 1449 n. 11. Therefore, the defendants appear to concede that the MMLB can be built as a matter of sound engineering. For these reasons, the MMLB appears to be feasible.

The remaining question is whether the MMLB is imprudent. The ROD, the "Environmental Reevaluation (ER) for the Route 710 Freeway" prepared by Caltrans and the FHWA in April 1998 (the "Environmental Reevaluation"), the "Final Revised Section 4(f) Evaluation for the Route 710 Freeway" prepared by Caltrans and the FHWA in April 1997 ("Final 4(f) Evaluation"), and the Caltrans MMLB Report discuss the MMLB. However, the ROD, the Environmental Reevaluation, and the Final 4(f) Evaluation rely on the analysis contained in the Caltrans MMLB Report. The Caltrans MMLB Report found "that [the MMLB] requires the use of Section 4(f) resources and does not meet the various project needs." (AR 103:96–4285–96–4286 (Caltrans MMLB Report); AR 129:98–1792–98–1793 (Final 4(f) Evaluation).)

The Ninth Circuit has stated, "[a]lternatives that do not accomplish the purposes of the project may properly be rejected as imprudent." *Arizona Past & Future Found., Inc. v. Lewis*, 722 F.2d 1423, 1428 (9th Cir.1983); *accord Alaska Ctr. for the Env't v. Armbrister*, 131 F.3d 1285, 1288–89 (9th Cir.1997).

Here, Caltrans found that the MMLB did not accomplish any of the "purposes of

---

13. SCAG "is the Metropolitan Planning Organization for the Counties of Imperial, Los Angeles, Orange, Riverside, San Bernardino and Ventura, and has been ... designated by federal and state statutes as the agency responsible for regional transportation planning within its jurisdiction." (AR 80:94–2209.) The SCAG 1994 Regional Mobility Element "is the principal long-range planning document for the SCAG region." (AR 80:94–2220.) This document serves as the Regional Transportation Plan mandated by the Clean Air Act. (AR 80:94–2215.)

14. The Los Angeles County Metropolitan Transit Authority ("LACMTA") is the municipal agency responsible for public transit in Los Angeles County.

15. The Blue Line Light Rail Transit ("LRT") is part of the Los Angeles light rail system that is currently being developed and built. The Blue Line will parallel the 710 Freeway from Long Beach to Downtown Los Angeles. It will then move Northeast from Downtown to South Pasadena and Pasadena, terminating in East Pasadena. This portion parallels the proposed 710 Freeway Project.

16. The Court construes this as meaning that light rail will serve different needs from the proposed freeway and will not lessen the demand for this freeway.

this project." (AR 103:96–4285 (Caltrans MMLB Report).) Assuming that the defendants have properly analyzed the MMLB, this finding would render the MMLB imprudent. *Arizona Past & Future,* 722 F.2d at 1429. Therefore, unless the plaintiffs can show that the Caltrans MMLB Report is based upon erroneous assumptions or material mistakes of fact (*see infra* Part II–B–1–b), the Court cannot conclude that the plaintiffs have met their burden in establishing that the defendants did not adequately evaluate the MMLB.

b. *Whether the Caltrans MMLB Report is based upon erroneous assumptions or material mistakes of fact*

The plaintiffs assert that the Caltrans MMLB Report is defective for several reasons. First, they assert that the report used criteria that favored a freeway solution. Second, they assert that the report is defective because it is based upon erroneous factual assumptions.

i. *Whether the Caltrans MMLB Report used criteria that favored a freeway solution*

The FHWA has an obligation to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). The plaintiffs argue that the defendants used biased criteria to reject the MMLB. The defendants argue that they are vested with the authority to determine what the purpose and needs are of a project and that the MMLB did not meet the purpose and needs of this project.

"[A]n agency may not define the objectives of its actions in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality." *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 196 (D.C.Cir.1991); *see also Sierra Club, Illinois Chapter v. United States Dept. of Transp.,* 962 F.Supp. 1037, 1042 (N.D.Ill.1997).

Here, the defendants rejected the MMLB in part based on freeway-oriented criteria such as "completing the freeway network" and "completing the HOV network." (*See* AR 103:96–4251 (Caltrans MMLB Report).) However, the defendants also rejected the MMLB based on non-freeway-oriented criteria such as reducing primary and local street congestion, improving mobility and accessibility, reducing accident and fatality rates, and improving air quality. (*See* AR 103:96–4251 (Caltrans MMLB Report).) Given the inclusion of both freeway-oriented and non-freeway-oriented criteria, the Court cannot agree that the defendants used biased criteria in rejecting the MMLB.

ii. *Whether the Caltrans MMLB Report is based upon erroneous factual assumptions*

The plaintiffs argue that the Caltrans MMLB Report mischaracterized the MMLB. The MMLB proposed traffic management measures on primary streets and arterials. In contrast, the Caltrans MMLB Report characterized the MMLB as proposing traffic calming measures on primary streets and arterials. The plaintiffs cite two quotes in the executive summary in the Caltrans MMLB Report that refer to traffic calming on primary streets and arterials. (AR 103:96–4246 (Caltrans MMLB Report) stating, "Traffic calming on primary arterials used by the buses exacerbates the general levels of congestion especially in the city of Pasadena;" AR 103:96–4249 (Caltrans MMLB Report) stating, "The Low Build will increase congestion by removing a section of existing freeway, and reducing free flow speeds and capacities on primary streets with *traffic calming* " (emphasis in original).) The defendants deny that they mischaracterized the MMLB.

The MMLB proposes the use of "Arterial Street Traffic Management." This "includes state-of-the-art traffic signals on most major surface arterial streets in the corridor" that will "improve travel speeds, reduce intersection delays, respond to ac-

tual travel conditions on a near-instantaneous basis, and will permit sophisticated local responses to incidents ... and other common causes of traffic delay." (AR 74:93–5245 (MMLB).) Additionally, the MMLB states that it will employ "Residential Street Calming" which will "remove through (non-local) trips from streets that are unsuitable for commuters." (AR 74:93–5246 (MMLB).)

Traffic calming measures are actions taken to slow traffic and divert it from residential streets to larger streets capable of handling increased traffic flow. (AR 74:93–5254 (MMLB).) Examples of these measures include reducing the width of streets, diverting traffic by blocking certain intersections, adding medians to streets, adding speed bumps, and using roundabouts ("traffic circles") in certain intersections. (AR 74:93–5254 (MMLB).)

Traffic management measures, in contrast, are actions taken to improve the efficiency of traffic flow along primary arterials. The primary functions are to "provide additional capacity to meet current and future traffic demands, and improve peak period travel speeds and traffic flow so as to provide maximum efficiency and safety." (AR 74:93–5252 (MMLB).)

The Caltrans MMLB Report contains multiple examples of citing the MMLB for saying that which it does not say. (*See* AR 103:96–4256, 103:96–4277 (Caltrans MMLB Report).) The Caltrans MMLB Report cites the MMLB for proposing traffic calming measures on primary arterials such as Orange Grove Boulevard, Fremont Avenue between the 110 Freeway and Huntington Drive, Marengo Avenue between Del Mar Boulevard and Glenarm Street, and California Boulevard between Orange Grove Boulevard and Fair Oaks Avenue and East of Arroyo Parkway (AR 103:96–4256 (Caltrans MMLB Report).)

■ The MMLB proposed traffic management measures on several of these primary arterials or did not make any pro-

posals for these arterials. (AR 74:93–5253 (MMLB).) The MMLB proposed limiting traffic calming to residential streets where appropriate. (AR 74:93–5253–93:5254 (MMLB).) The MMLB identifies California Boulevard east of Fair Oaks Avenue as a candidate for arterial street management. (AR 74:93–5253 (Figure 4–9) (MMLB).) The MMLB identifies Fremont Avenue between the 110 Freeway and Huntington Drive as part of the "Low Build Connector"—a traffic management system to improve the flow of traffic between Fremont Avenue and Fair Oaks Avenue. (AR 74:93–5247 (Figure 4–1) (MMLB).) Although the MMLB does not discuss Orange Grove Boulevard specifically, Orange Grove is a primary arterial with on-ramps to the 110 Freeway on the south and the 134 and 210 Freeways on the north. (AR 103:96–4256, 103:96–4277 (Caltrans MMLB Report).) The Court takes judicial notice of the fact that Orange Grove allows access to several significant sites such as the Norton Simon Museum, the Tournament of Roses Parade, Old Pasadena, and the Rose Bowl from the 110, 134 and 210 Freeways as well as serving as a major conduit for traffic entering these freeways from the western parts of Pasadena and South Pasadena. Likewise, the MMLB does not call for traffic calming on Marengo Avenue. However, the Caltrans MMLB Report calls for traffic calming on Marengo Avenue, which is a primary arterial. (AR 103:96–4277 (Caltrans MMLB Report).)

These errors are significant because the defendants criticized the MMLB for negatively impacting local traffic. (AR 103:96–4285 (Caltrans MMLB Report).) Logically, placing traffic calming measures on primary arterial streets will have a two-fold effect on traffic. First, it will slow traffic on the calmed arterial streets significantly exacerbating congestion on those streets. Second, it will cause traffic to spill-over onto non-calmed primary arterials as motorists avoid the calmed streets. This will increase congestion along the non-calmed primary arterials as well.

The defendants' conclusion that the MMLB does not meet the purpose and need of the project is suspect because of these errors. Specifically, the Caltrans MMLB Report concludes that the MMLB does not reduce primary street congestion, reduce local street congestion, improve mobility and accessibility, promote transit ridership, reduce drive alone car trips, reduce accident and fatality rates, or improve air quality. (AR 103:96–4285 (Caltrans MMLB Report).) The MMLB specifically discusses these issues as being alleviated by employing arterial street traffic management and residential street traffic calming. (AR 74:93–5245–93–5246 (MMLB).)

■ Given the above, the plaintiffs have shown a probability of success on the merits in proving that the defendants have not rigorously or objectively evaluated the MMLB. Evaluation of alternatives to the proposed project is the "heart of the environmental impact statement." 40 C.F.R. § 1502.14. Further, the purpose of these statements is to "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.* " 'The existence of a viable but unexamined alternative renders an environmental impact statement inadequate.' " *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison,* 67 F.3d 723, 729 (9th Cir.1995), *quoting Resources Ltd., Inc. v. Robertson,* 35 F.3d 1300, 1307 (9th Cir.1993).

Furthermore, the Final 4(f) Evaluation, the Environmental Reevaluation, and the ROD specifically rely on the flawed Caltrans MMLB Report for the conclusion that the MMLB does not meet the purpose and need of this project. (AR 129:98–1674–98–1680 (Environmental Reevaluation); AR 129:98–1793–98–1794 (Final 4(f) Evaluation); AR 129:98–1875, 129:98–1886–98–1887(ROD).) Therefore, the plaintiffs have made a strong showing that the defendants did not rigorously and ob-

jectively explore all alternatives to the 710 Freeway Project in violation of Section 4(f).

### 2. *Whether the defendants failed to properly evaluate the constructive use of historic resources*

■ The plaintiffs argue that the defendants improperly found that the 710 Freeway Project will not result in the constructive use of Section 4(f) resources. The defendants argue that they properly evaluated the existence of potential constructive uses of Section 4(f) resources and found that none exist.

A use occurs "[w]hen land is permanently incorporated into a transportation facility; . . . [w]hen there is a temporary occupancy of land that is adverse in terms of the statute's preservationist purposes . . . ; or . . . [w]hen there is a constructive use of land." 23 C.F.R. § 771.135(p)(1)(i-iii). The regulations state:

Constructive use occurs when the transportation project does not incorporate land from a Section 4(f) resource, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under Section 4(f) are substantially impaired. Substantial impairment occurs only when the protected activities, features, or attributes of the resource are substantially diminished. . . .

The Administration has reviewed the following situations and determined that a constructive use occurs when:

ʻ(i) The projected noise level increase attributable to the project substantially interferes with the use and enjoyment of a noise-sensitive facility of a resource protected by Section 4(f), such as hearing the performances at an outdoor amphitheater, sleeping in the sleeping area of a campground, enjoyment of a historic site where a quiet setting is a generally recognized feature or attribute of the site's significance, or enjoyment of an

urban park where serenity and quiet are significant attributes;

(ii) The proximity of the proposed project substantially impairs esthetic features or attributes of a resource protected by Section 4(f), where such features or attributes are considered important contributing elements to the value of the resource. Examples of substantial impairment to visual or esthetic qualities would be the location of a proposed transportation facility in such proximity that it obstructs or eliminates the primary views of an architecturally significant historical building, or substantially detracts from the setting of a park or historic site which derives its value in substantial part due to its setting;

(iii) The project results in a restriction on access which substantially diminishes the utility of a significant publicly owned park, recreation area, or a historic site;

(iv) The vibration impact from operation of the project substantially impairs the use of a Section 4(f) resource, such as projected vibration levels from a rail transit project that are great enough to affect the structural integrity of a historic building or substantially diminish the utility of the building; or

(v) The ecological intrusion of the project substantially diminishes the value of wildlife habitat in a wildlife or waterfowl refuge adjacent to the project or substantially interferes with the access to a wildlife or waterfowl refuge, when such access is necessary for established wildlife migration or critical life cycle processes.

*Id.* § 771.135(p)(2), (4).

The plaintiffs argue that the 710 Freeway Project will constructively use historic resources by "substantially impair[ing] esthetic features or attributes of a re-source protected by section 4(f), where such features or attributes are considered important contributing elements to the value of the resource." *Id.* § 771.135(p)(4)(ii). The plaintiffs argue that the proximity of the freeway to historic properties results in at least two forms of constructive use. First, to the extent that the overall setting of a property is a feature or attribute considered to be an important contributing element to the historic value of the property, this attribute will be impaired. Second, the plaintiffs argue that the mere proximity to the freeway of the historic properties will result in additional impairments.

The defendants argue that they examined the Section 4(f) resources in the Corridor and found that "setting is not a major aspect of the qualities which make [specific properties] eligible for the National Register." (AR 129:98–1798–98–1802 (Final 4(f) Evaluation).) The plaintiffs argue that the defendants did not credit the significance of setting to the properties. Specifically, the plaintiffs argue that the defendants merely repeat the same conclusion about each property without having conducted a thorough review. (*See, e.g.,* AR 129:98–1798–98–1802 (Final 4(f) Evaluation).) The plaintiffs note that the defendants' conclusion that there will be no constructive use of Section 4(f) resources contradicts that of the Advisory Council.[17] (*See* AR 128:98–1085–981086.) The Advisory Council has stated that the 710 Freeway Project will result in "[a]t least 69 historic structures ... [being] adversely affected directly through demolition, relocation, or *substantial alteration of their setting.*" (AR 128:98–1083 (emphasis added).) Additionally, the Advisory Council stated that this project "will cause a major disruption to the cohesive fabric of the affected historic districts.... There is no acceptable mitigation method that will

---

**17.** The Advisory Council on Historic Preservation is the agency responsible for administering Section 106 of the National Historic Preservation Act and determines whether federal projects will adversely affect historic properties. *See* 36 C.F.R. § 800.5. The Advisory Council determined that many of the properties not used by this project will be adversely affected. (*See* AR 118:97–2204.) However, a finding of adverse effect under § 106 does not necessarily equate to a finding of constructive use under Section 4(f).

repair the damage to community cohesion within the historic districts that will be severed or impacted by the construction and placement of an eight-lane freeway." (AR 128:98–1083.) The Advisory Council concluded by stating that "impacts of the proposed Route 710 Freeway upon historic properties are massive and unacceptable." (AR 128:98–1084.)

The Advisory Council—an agency charged with examining the effects of federal projects on historic sites—believes that setting is significant, especially with regard to historic districts. The defendants' Final 4(f) Evaluation, however, concludes that setting is not significant to these properties.

The federal regulations define an historic district as:

a geographically definable area, urban or rural, possessing a significant concentration, linkage, or continuity of sites, buildings, structures, or objects united by past events or aesthetically by plan or physical development.

36 C.F.R. § 60.3(d). It appears that the historic districts at issue here are significant because of the aesthetics rather than the history involved. However, the defendants offer no analysis. The defendants merely conclude that "setting is not a major aspect of the qualities which make the district eligible for the National Register." (AR 129:98–1801 (Final 4(f) Evaluation) (describing Buena Vista Historic District).) The Court finds that there are serious questions as to whether the settings of these properties, either standing alone or in an historic district, contribute at least in part to their historic eligibility.

In addition to setting, another issue is the proximity of several historic sites to the 710 Freeway Project. The project comes within 15 feet of the Short Line Villa Tract Historic District. Courts have found that there is constructive use in situations where there is a greater distance between the project and the Section 4(f) resources. See, e.g., Coalition Against Raised Expressway, Inc. v. Dole, 835 F.2d

803, 811 (11th Cir.1988) (on-ramp within 43 feet of Section 4(f) structure is a constructive use); Stop H–3 Ass'n v. Coleman, 533 F.2d 434, 439 (9th Cir.1976) (construction of six-lane controlled access highway passing within 100–200 feet of Section 4(f) resource is a constructive use).

The Court finds that the plaintiffs have shown that there are serious questions going to the merits as to whether the defendants abused their discretion in finding that the 710 Freeway Project will not result in any constructive uses of eligible historic resources.

3. *Whether the defendants improperly failed to review properties of state and local historic significance*

a. *Whether the regulation is invalid*

Section 4(f) states that covered properties include: "land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site)." 49 U.S.C. § 303(c) (1994). The federal regulation promulgated under this provision, however, states:

In determining the application of section 4(f) to historic sites, the Administration, in cooperation with the applicant, will consult with the State Historic Preservation Officer (SHPO) and appropriate local officials to identify all properties on or eligible for the National Register of Historic Places (National Register). The section 4(f) requirements apply only to sites on or eligible for the National Register unless the Administration determines that the application of section 4(f) is otherwise appropriate.

23 C.F.R. § 771.135(e).

The plaintiffs argue that this regulation-limiting application of Section 4(f) to properties listed on the National Register contradicts Section 4(f). The defendants argue that invalidating this regulation would make the reviewing process so unwieldy that no projects could ever be built. Additionally, the defendants argue that expand-

ing Section 4(f) to properties that are not eligible for the National Register would frustrate the purposes of the statute because properties may be included by state or local officials for political reasons or without sufficient professional guidance.

The Court has not found authority discussing whether this regulation is consistent with Section 4(f).

■ In reviewing the legality of a regulation, the court must apply the Administrative Procedure Act ("APA"). The APA states that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). A right of action for challenging the validity of a regulation accrues when the regulation is adopted. *Bicycle Trails Council of Marin v. Babbitt,* 82 F.3d 1445, 1456 n. 5 (9th Cir.1996). Here, the regulation was adopted in 1980. *See* 44 Fed.Reg. 59438 (1980). Therefore, the plaintiffs are barred from challenging the validity of this regulation. *See Bicycle Trails,* 82 F.3d at 1456 n. 5.

b. *Whether the defendants properly considered whether to include California eligible properties as Section 4(f) resources*

The regulations state that Section 4(f) is limited to historic sites qualifying for the National Register. The regulations also allow the Administration to include other properties where appropriate. 23 C.F.R. § 771.135(e).

■ The plaintiffs argue that the defendants should have included properties eligible for the California Register in the Section 4(f) analysis. California enacted the California Register law in 1992. *See* Cal. Pub. Res.Code § 5024.1. This law has a register system similar to the National Register. *Id.* The California Register is broader than the National Register. In addition to including all resources which are eligible for the National Register, the California Register also permits the inclu-

sion of "a range of historical resources which better reflect the history of California." 14 Cal.Code Regs. § 4852. The California Register is less restrictive when it comes to properties which may be structurally compromised. "It is possible that historical resources may not retain sufficient integrity to meet the criteria for listing in the National Register, but they may still be eligible for listing in the California Register." *Id.* § 4852(c).

The defendants argue that they did not consider properties eligible for the California Register because the State did not adopt eligibility criteria for inclusion on the California Register until January 1998. *See id.* The defendants argue that the State issued the eligibility criteria too late to be considered. (Fed. Opp. at 25:4–8.)

The plaintiffs have provided no information demonstrating that the defendants' decision to not consider additional properties was arbitrary or capricious. The record established that the defendants had a valid reason for not exercising discretion to include these additional properties. The Court finds that the plaintiffs have not demonstrated serious questions going to the merits of whether the defendants improperly failed to exercise discretion to apply Section 4(f) to all properties eligible for the California Register.

c. *Whether the defendants' commitment to include California eligible properties is binding*

■ The plaintiffs argue that Caltrans committed itself to include California eligible properties in the Section 4(f) analysis upon adoption of regulations defining California's eligibility criteria. Caltrans's "Caltrans Final Mitigation Enhancement Recommendations for Route 710 Project," written in 1994—two years after the California Register law was enacted but before the state adopted regulations—states:

Caltrans will comply with the following recommendations when appropriate criteria are adopted:

1. Determination of California Register eligible properties adhering to standards other than those of the National Register.

2. Development of mitigation measures for these properties.

If it is determined that these criteria are applicable to projects with adopted environmental documents which are not yet constructed, Caltrans will conduct a re-evaluation of the project route as required by law.

(AR 75:93–5917.)

There is no evidence that Caltrans has complied with its commitments to determine the existence of California eligible properties, to develop mitigation measures for these properties, or to reevaluate the proposed route with reference to these properties. The defendants do not explain why they are no longer adhering to the commitments Caltrans made in 1994.

In "actions where the Administration exercises sufficient control to condition the permit or project approval" the regulations state, "It shall be the responsibility of the applicant [Caltrans], in cooperation with the Administration to implement those mitigation measures stated as commitments in the environmental documents prepared pursuant to this regulation." 23 C.F.R. § 771.109(a)(1), (b).

In interpreting similar regulations under the National Environmental Protection Act ("NEPA"), the Ninth Circuit has held that once an agency makes a commitment to certain mitigation measures, those mitigation measures must be implemented. *See Tyler v. Cisneros*, 136 F.3d 603, 608 (9th Cir.1998) (noting that once agency is committed, even if it was not required originally to take such action, the agency must implement that commitment). Additionally, the ROD reiterates this commitment by stating, "All mitigation features promised in the environmental documents and developed and agreed to since approval of the FEIS in 1992, and those developed by the design advisory groups and agreed to by FHWA and Caltrans, will be implemented." (AR 129:98–1871(ROD).)

Caltrans made significant commitments to include California eligible properties in the Section 4(f) analysis. The administrative record indicates that the defendants did not keep these commitments. The defendants have noted that it would have been impossible for them to have kept these commitments given the approximately three months between California's adoption of the eligibility criteria and Secretary Slater's signature on the ROD. However, having committed themselves to this analysis, the appropriate course was for the defendants to fulfill the commitments before they issued the ROD. Therefore, the plaintiffs have shown a strong probability of succeeding on the merits of this claim.

4. *Whether the defendants were obligated to cure the non-concurrence of the Department of the Interior*

 The plaintiffs argue that the defendants did not cure the non-concurrence of the DOI. The defendants agree, but argue that no cure was necessary.

The plaintiffs have cited no cases or statutory authority stating that the DOI must concur with Section 4(f) decisions made by the FHWA. Although Section 4(f) does mandate that the FHWA confer with other agencies such as the DOI, it does not give these agencies any control, veto, or voting power. *See* 49 U.S.C. § 303(b). Further, the regulations state: "The section 4(f) evaluation shall be provided for coordination and comment to the officials having jurisdiction over the section 4(f) property and to the Department of the Interior." 23 C.F.R. § 771.135(i).

The plaintiffs cannot establish that the defendants' acts were arbitrary, capricious or an abuse of discretion when they failed to cure the non-concurrence of the DOI.

C. *Conclusion as to whether defendants violated Section 4(f).*

The plaintiffs have asserted four violations of Section 4(f): (1) the defendants

failed to properly evaluate the MMLB; (2) the defendants failed to properly consider constructive use impacts; (3) the defendants failed to fulfill their commitment to include in their analysis properties eligible for the California Register which are ineligible for the National Register; and (4) the defendants failed to cure the non-concurrence of the DOI. On the first and third claims, the plaintiffs have shown a probability of success on the merits. On the second claim, the plaintiffs have shown serious questions going to the merits. On the fourth claim, the plaintiffs have not met their initial burden.

### III. Whether the defendants complied with the National Environmental Protection Act

#### A. *Introduction and standard of review*

The issue is whether the Secretary complied with the National Environmental Protection Act ("NEPA") in deciding that an SEIS was not required before the issuance of the ROD.

NEPA requires that the approving agency take a "hard look" at the environmental consequences of the proposed project. *Oregon Natural Resources Council v. Marsh,* 52 F.3d 1485, 1488 (9th Cir. 1995). Although courts "must defer to the informed discretion of the responsible federal agencies, and are not to 'fly speck' environmental impact statements, [courts] will reverse an agency's decision where it is contrary to procedures required by law, or where it is arbitrary or capricious." *Id.* (internal quotations and citations omitted). "NEPA does not mandate particular substantive results, but instead imposes only procedural requirements." *Laguna Greenbelt, Inc. v. United States Dept. of Transp.,* 42 F.3d 517, 523 (9th Cir.1994), citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

The Ninth Circuit has stated that under its "'rule of reason,' [courts] determine 'whether the [EIS] contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences' by making 'a pragmatic judgment whether the [EIS's] form, content and preparation foster both informed decision-making and informed public participation.'" *Id., quoting Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1356 (9th Cir.1994).

The plaintiffs claim that the Secretary failed to comply with NEPA for four reasons: (1) three other federal agencies found that the defendants did not comply with NEPA; (2) the defendants failed to properly evaluate a low-build alternative such as the MMLB; (3) the defendants failed to prepare an SEIS; and (4) the defendants failed to consider indirect and cumulative effects of the 710 Freeway Project.

#### B. *Discussion*

#### 1. *Whether objections of other agencies demonstrate that the defendants did not comply with NEPA*

 Three federal agencies have criticized various aspects of this project: the EPA, the DOI, and the Advisory Council. (*See supra* Part II–B–4.) The plaintiffs argue that these agencies concluded that the "defendants failed to adequately assess adverse impacts and the Low Build alternative, and failed to require a Supplemental EIS, despite significant new circumstances and information and substantial changes in the project." (Mot. at 23:11–13, *citing* AR 92:95–3475; 110:96–7786; 128:98–0984; 128:98–1085.)

The courts have held that NEPA's purpose is "to insure a fully informed and well-considered decision." *Sierra Club v. United States Army Corps of Eng'rs,* 701 F.2d 1011, 1029 (2d Cir.1983), *quoting Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980). The defendants acknowledge that NEPA requires them to

obtain and consider comments from other federal agencies. However, they argue that NEPA did not require the defendants to delegate decision-making authority to these agencies. The defendants are correct. (*See supra* Part II–B–4.)

However, a "court may properly be skeptical as to whether an EIS's conclusions have a substantial basis in fact if the responsible agency has apparently ignored the conflicting views of other agencies having pertinent expertise." *Sierra Club*, 701 F.2d at 1030; *see also Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir.1973) (stating that there must be some good faith, reasoned analysis in response to situations where "sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives.").

The defendants argue that they alone are vested with the discretion to determine the purpose and need of a proposed project. The defendants argue that the commenting agencies' objections were limited to the defendants' analysis of the purpose and need of the 710 Freeway Project and whether low build and other alternatives met the purpose and needs of the project. Therefore, the defendants argue that the objections are outside the expertise and responsibility of the commenting agencies.

It does not appear that the objections were so limited. For example, the EPA stated on March 4, 1998 that because the Final EIS for this project was more than six years old and because there had been significant changes to the project, an SEIS was necessary. (AR 128:98–0987.) The EPA noted that these changes include the addition of several cut-and-cover tunnels, one of which may not be technically feasible. The EPA also stated that the defendants had not properly evaluated a technically feasible low-build option. The EPA stated that these concerns mandated the production of an SEIS. Contrary to the defendants' assertion, these comments do not relate to purpose and need, but go to an area within the expertise of the EPA—

when further environmental review is required.

There is no indication in the Administrative Record that the Secretary responded to these comments before signing the ROD on April 13, 1998. Therefore, although this non-concurrence does not necessarily invalidate the NEPA process, the Court "may properly be skeptical as to whether an EIS's conclusions have a substantial basis in fact." *Sierra Club*, 701 F.2d at 1030.

### 2. Whether the defendants properly evaluated the MMLB

 The plaintiffs argue that the defendants failed to properly analyze the MMLB. The plaintiffs' argument is that the defendants based their conclusion on erroneous assumptions that skewed the results of the MMLB analysis contained in the Caltrans MMLB Report. (*See supra* Part II–B–1.) The defendants argue that they rejected the MMLB because it did not meet the purpose and need of the project.

As explained above, the plaintiffs have shown a likelihood of success in establishing that the erroneous factual assumptions that the defendants made while analyzing the MMLB establish that the defendants never "rigorously and objectively evaluated" the MMLB. (*See id.*)

40 C.F.R. § 1502.14 states that the evaluation of alternatives to the proposed project is the "heart of the environmental impact statement." The purpose of an EIS is to "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.* The administration must "[r]igorously explore and objectively evaluate all reasonable alternatives." *Id.* at § 1502.14(a).

"The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Alaska*

*Wilderness,* 67 F.3d at 729, *quoting Resources Ltd.,* 35 F.3d 1300 (9th Cir.1994).

The plaintiffs have shown a likelihood of success that the defendants acted arbitrarily or capriciously in rejecting the MMLB as not meeting the purpose and need of the project.

### 3. *Whether the defendants were required to prepare a supplemental environmental impact statement*

The plaintiffs also argue that the defendants' decision not to prepare an SEIS prior to approval of the ROD was an abuse of discretion. The plaintiffs argue that the project has significantly changed since the defendants issued the FEIS in 1992, and that the defendants must complete an SEIS to conform with NEPA. The defendants argue that the changes are minor in the context of the entire project. They argue that the changes were implemented to mitigate impacts on the environment and to historical resources. Further, they argue that the ROD requires that the defendants perform a feasibility study and an SEIS before the project can proceed.

In determining when an agency must prepare an SEIS, the federal regulations state:

> An EIS shall be supplemented whenever the Administration determines that: (1) Changes to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or (2) New information or circumstances relevant to environmental concerns and bearings on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS.

23 C.F.R. § 771.130(a); *see also* 40 C.F.R. § 1502.9(c)(1). When an SEIS is required, the agency must include the SEIS in the administrative record and must "prepare, circulate, and file" the SEIS in the same fashion as the draft or FEIS upon which it comments. 40 C.F.R. § 1502.9(c)(3),(4); *see also* 23 C.F.R. § 771.130(d). This means

that an SEIS must be prepared prior to the issuance of the ROD.

However, the regulations also state that:

> [A] supplemental EIS will not be necessary where: (1) The changes to the proposed action, new information, or new circumstances result in a lessening of adverse environmental impacts evaluated in the EIS without causing other environmental impacts that are significant and were not evaluated in the EIS; or (2) The Administration decides to approve an alternative fully evaluated in an approved final EIS but not identified as the preferred alternative.

23 C.F.R. § 771.130(b).

The plaintiffs make three arguments regarding the preparation of an SEIS: (1) that an SEIS was necessary; (2) that the FEIS is deficient; and (3) that conducting an SEIS after issuing the ROD violates NEPA.

### a. *Whether an SEIS was necessary*

The plaintiffs make several arguments regarding why the Secretary's decision to not require an SEIS violates NEPA: (1) the changes and new information are significant; (2) this decision frustrates NEPA's mandate for full public disclosure of the 710 Freeway Project's environmental consequences; and (3) studies prepared after the FEIS cannot substitute for an SEIS.

### i. *Whether changes and new information are significant*

The regulations require that the defendants prepare an SEIS whenever changes in the project or new information relevant to environmental concerns would result in significant environmental impacts not evaluated in the FEIS. 23 C.F.R. § 771.130(a). The regulations state, "'Significantly' as used in NEPA requires considerations of both context and intensity." 40 C.F.R. § 1508.27. "Context" means the "significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the

affected interests, and the locality[;] [s]ignificance varies with the setting of the proposed action." *Id.* § 1508.27(a). "Intensity" means "the severity of [the] impact." *Id.* § 1508.27(b). The regulations list several considerations which the administration must weigh in evaluating intensity, including:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

*Id.* § 1508.27(b)(1)-(10); *see also Price Road Neighborhood Ass'n v. United States Dept. of Transp.,* 113 F.3d 1505, 1510 (9th Cir.1997) (stating that definition of significant at 40 C.F.R. § 1508.27 applies in context of determining whether supplemental documentation is necessary).

The plaintiffs assert that the changes made after the adoption of the FEIS will create significant environmental impacts that the defendants did not evaluate or comment upon in an EIS. These include depressing the freeway through the corridor by "digging a massive trench through seismically unstable hillsides, the construction of six cut-and-cover tunnel lids within 4.5 miles, and the moving, long-term storage, and reconstruction of at least 44 historic properties, most on top of the tunnel lids." (Rep. at 23:12–15.) The plaintiffs acknowledge that some of these modifications reduce some environmental impacts. However, the plaintiffs argue that the modifications also create new problems which have not been evaluated in an EIS.

The defendants argue that an SEIS is unnecessary because the changes in the project are not significant and because the changes were designed to mitigate specific environmental and other concerns. The defendants reached this conclusion based upon their analysis of the modifications in the Environmental Reevaluation.

[W]hen faced with a project change, the FHWA may conduct a reevaluation to determine the significance of the new design's environmental impacts and the continuing validity of its initial [EIS]. A supplemental [EIS] is not automatically required under the regulations, but rather its necessity is dependent upon the

findings and conclusions reached by the FHWA through its reevaluation process. *Price Road,* 113 F.3d at 1510. Here, the Environmental Reevaluation concluded that "the identified changes and the resulting impacts do not result in overall additional adverse impacts, and there are no new circumstances, or new information relevant to the project that would result in significant adverse impacts not identified in the DEIS, or the 1st, 2nd or 3rd SDEIS, or FEIS." (AR 129:98–1727 (Environmental Reevaluation).)

*Price Road* discusses the methods available to the defendants in determining whether an SEIS is necessary. *Price Road,* however, does not limit the Court's function in ensuring that the defendants have fully complied with NEPA's mandate. In this regard, the Supreme Court has stated:

> in the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information.

*Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Accordingly, the Court must review the defendants' preparation of the Environmental Reevaluation to ensure that the defendants complied with NEPA.

The plaintiffs challenge the findings in the Environmental Reevaluation. The plaintiffs argue that the report "spends more than 72 pages describing the project changes and the new information developed since the EIS was issued." (Rep. at 24 n.22.) The plaintiffs then argue, "It is ludicrous for defendants to dismiss those 72 pages of changes and new information as insignificant." (*Id.*) Additionally, the plaintiffs argue that the EPA, the DOI and the Advisory Council all stated that an

SEIS was necessary. (*See* AR 128:98–1085–98:1086 (Advisory Council); AR 128:98–0984(EPA); AR 110:96–7786(DOI).) Finally, the plaintiffs argue that in the "Briefing for the Advisory Council on Historic Preservation on the Selected Alternative for the California Route 710 Freeway" the FHWA stated, "FHWA firmly believes that the alternative [710 Freeway Project] proposed for selection in the ROD is so *fundamentally different* from the 1992 FEIS preferred alternative that a referral to the CEQ is no longer warranted." (AR 124:97–5466 (emphasis added).) The plaintiffs argue that the defendants cannot state that the project is "fundamentally different" from that contained in the 1992 FEIS and state that the project has not been significantly changed. The defendants, however, assert that these statements are consistent because the changes "have resulted in markedly reduced overall project impacts and impacts on historic resources." (AR 124:97–5466.)

Likewise the plaintiffs argue that the Environmental Reevaluation raises significant new information which the defendants did not address in the FEIS. The Environmental Reevaluation lists 33 different studies and reports that the defendants conducted between the FEIS and the ROD. (AR 129:98–1638–98–1639 (Environmental Reevaluation).)

The plaintiffs argue that the FEIS is deficient in two respects: (1) the MMLB was never addressed in the FEIS—because the proposal did not exist in 1992; and (2) the FEIS did not properly discuss impacts the 710 Freeway Project will have on air quality in the region.

The defendants argue that they addressed these concerns in the NEPA process. They argue that the MMLB was properly rejected as not meeting the purpose and need of the project. They also argue that the FEIS discusses air quality impacts and that the defendants readdressed these issues when Caltrans prepared the "Air Quality Report" in March

1995 and the "Physical Environmental Report Supplement" in January 1996. (AR 85:95–0718 (Air Quality Report); AR 96:96–1004 (Physical Environmental Report Supplement).) The Environmental Reevaluation specifically discusses these reports. (AR 129:98–1689 (Environmental Reevaluation).)

The plaintiffs, however, argue that a defective EIS cannot be cured by subsequent reports and studies. *See Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1072 (1st Cir.1980); *I–291 Why? Ass'n v. Burns,* 517 F.2d 1077, 1081 (2d Cir.1975); *Association Concerned About Tomorrow, Inc. v. Dole,* 610 F.Supp. 1101 (N.D.Tex.1985).

The Court finds that given the defendants' commitment to conduct an SEIS (*see infra* Part III–B–3–b), the Court need not decide whether the plaintiffs have met their burden on this issue. The Court notes that the plaintiffs have raised questions as to whether the defendants acted properly in concluding in the Environmental Reevaluation that there was no need to prepare an SEIS. Specifically, the Court notes that three other federal agencies with expertise in the area found that an SEIS was necessary for this project given the changes in the project and new information now available. (*See* AR 128:98–1085–98:1086 (Advisory Council); AR 128:98–0984(EPA); AR 110:96–7786(DOI).) Additionally, the Court notes that the Environmental Reevaluation specifically relies on the Caltrans MMLB Report (AR 129:98–1674–98:1680 (Environmental Reevaluation)), which this Court has found may be flawed. (*See supra* Part II–B–1–b–ii.) The Court also notes that the defendants have made many changes to the 710 Freeway Project since the FEIS, including incorporating additional cut-and-cover tunnels, depressing the freeway through the Corridor rather than using an elevated freeway, eliminating the 710–110 Freeway interchange, and changing the freeway's right-of-way to avoid the Short Line Villa Tract Historic District. Nonetheless, the

Court concludes that the issue of whether the defendants acted properly in reaching the conclusions contained within the Environmental Reevaluation will be more appropriately addressed during summary judgment.

ii. *Whether the defendants violated NEPA by not conducting sufficient public hearings*

The plaintiffs also argue that by failing to prepare an SEIS the defendants eliminated the public's right to participate and comment upon the changes made to the project between the adoption of the FEIS and the ROD. These changes include incorporating additional cut-and-cover tunnels, depressing the freeway through the Corridor rather than using an elevated freeway, eliminating the 710–110 Freeway interchange, and changing the freeway's right-of-way to avoid the Short Line Villa Tract Historic District.

The defendants are required to hold public hearings for projects such as this. *See* 23 C.F.R. § 771.111. "[P]ublic hearing procedures must provide for ... [c]oordination of public involvement activities and public hearings with the entire NEPA process." *Id.* at § 771.111(h)(2)(i).

The plaintiffs argue that the defendants conducted a number of studies and made many changes to the project that were never reviewed or commented upon by the public. The plaintiffs argue that this failure violates NEPA's essential function—to involve the public at all stages of the decision making process. *See Marsh,* 490 U.S. at 371–72, 109 S.Ct. 1851; *Environmental Defense Fund, Inc. v. Andrus,* 619 F.2d 1368, 1378 (10th Cir.1980); *Lathan v. Volpe,* 350 F.Supp. 262, 265 (W.D.Wash. 1972).

The plaintiffs argue that the defendants' decision to not hold public hearings on these changes is unreasonable. Therefore, they argue that the defendants must prepare an SEIS with appropriate public participation.

The defendants argue that there has been tremendous public involvement in this project for many years, and specifically since the publication of the FEIS. They point to several public hearings as well as the Mitigation Advisory Committee which held public hearings of its own.

The plaintiffs, however, argue that with regard to the Berkshire Shift, the defendants failed to hold an appropriate public hearing. The defendants make two arguments. First, the defendants argue that a public hearing was not necessary under federal law. Second, the defendants argue that they held an "open house" by opening a storefront in El Sereno for two weeks to facilitate the taking of comments. The defendants argue that this open house complies with federal public hearing requirements.

The Court finds that the parties have not adequately briefed this issue for the Court to determine whether a public hearing was required in the first instance. Accordingly, the Court does not find that the plaintiffs have met their burden on this issue.

However, in the event that a hearing was required, the plaintiffs have raised serious questions about whether the format of an open house is the equivalent of a public hearing. Both the pertinent statute and regulation require one or more public hearings. 23 U.S.C. § 128; 23 C.F.R. § 771.111(h). Public hearings provide the community and the decisionmakers a forum for the free and contemporaneous exchange of ideas. It is a dynamic process which has at its core the idea that it is only through a public meeting that details and intricacies of controversies can be best explored and understood.

b. *Whether an SEIS produced after issuance of the ROD is proper*

The ROD states, "This ROD will permit Caltrans to proceed with the design of the project and directs the preparation of a Supplemental EIS before construction will be authorized." (AR 129:98–1879(ROD).)

Therefore, whether or not an SEIS is necessary under the Environmental Reevaluation, the defendants have committed themselves to producing an SEIS for this project. The defendants will prepare the SEIS after the final design of the project but before construction will begin. (AR 129:98–1879(ROD).) The plaintiffs object to the timing of this SEIS.

The "heart" of the EIS is to "present the environmental impacts of the proposal and the alternatives in comparative form." 40 C.F.R. § 1502.14. Given this purpose, the plaintiffs argue that completing an SEIS after the project has been designed and fully authorized defeats the reason for the SEIS.

The regulations dealing with SEISs in general state:

In some cases, a supplemental EIS may be required to address issues of limited scope, such as the extent of proposed mitigation or the evaluation of location or design variations for a limited portion of the overall project. Where this is the case, the preparation of a supplemental EIS shall not necessarily:

(1) Prevent the granting of new approvals;

(2) Require the withdrawal of previous approvals; or

(3) Require the suspension of project activities; for any activity not directly affected by the supplement. If the changes in question are of such magnitude to require a reassessment of the entire action, or more than a limited portion of the overall action, the Administration shall suspend any activities which would have an adverse environmental impact or limit the choice of reasonable alternatives, until the supplemental EIS is completed.

23 C.F.R. § 771.130(f).

The ROD contains only one change in this project from the Environmental Reevaluation—the addition of a cut-and-cover tunnel in El Sereno. (AR 129:98–1871(ROD).) Therefore, if the SEIS re-

quired by the ROD is limited in scope to the cut-and-cover tunnel it may qualify under 23 C.F.R. § 771.130(f) as an evaluation of the "extent of proposed mitigation or the evaluation of location or design variations for a limited portion of the overall project." 23 C.F.R. § 771.130(f). If the SEIS is so limited, the defendants acted appropriately in enacting the ROD.

The ROD states:

FHWA will not advance mainline SR 710 projects to either right-of-way acquisition or construction authorization until it concludes that ... There is, given the extraordinary circumstances and cost related to this project and the passage of time expected to elapse between the signing of this ROD and the satisfaction of other conditions enumerated herein, a Supplemental Environmental Impact Statement prepared in accordance with NEPA focusing on the project which is the product of the design process established under this ROD and addressing any changed conditions, including changes in project purpose and need, and results of community involvement, including design activity group activities.

(AR 129:98–1871–98:1872(ROD).) It appears that the SEIS will evaluate the environmental consequences of the entire project just as an original EIS would. 23 C.F.R. § 771.130(d).

There is no indication, however, that the SEIS contemplated by the ROD is limited in scope within the meaning of 23 C.F.R. § 771.130(f). The ROD does not limit the scope of the proposed SEIS to addressing the "extent of proposed mitigation or the evaluation of location or design variations for a limited portion of the overall project." *Id.* § 771.130(f). The SEIS will focus "on the project which is the product of the design process established under [the] ROD." (AR 129:98–1871(ROD).) It will evaluate "changes in project purpose and need." (AR 129:98–1872(ROD).) The evaluation of the purpose and need of a 4.5 mile, approximately one billion dollar, freeway extension is not an issue of limited scope. For example, the defendants rejected the MMLB based on it not meeting the purpose and need of the project. If the SEIS finds that the purpose and need has changed, then the MMLB might prove to be a feasible and prudent alternative. By calling for the examination of the entire project and fundamental issues such as purpose and need, the SEIS called for in the ROD is not a limited SEIS within the meaning of 23 C.F.R. § 771.130(f).

■■■ The commitment to prepare an SEIS is binding on the defendants. *See* 23 C.F.R. § 771.109(a)(1), (b); *Tyler,* 136 F.3d at 608. Because there is no indication that 23 C.F.R. § 771.130(f) applies in this case, it appears that the defendants acted improperly in approving the ROD while committing themselves to preparing an SEIS evaluating the entire project.

Therefore, the plaintiffs have made a strong showing of a likelihood of prevailing on the merits that the defendants must complete an SEIS before this project can proceed. The Court recognizes that the defendants attempted to further alleviate the concerns associated with this project by including an SEIS in the ROD. NEPA, however, defines a set of procedures which the defendants must follow in reaching their decision. One procedure is the completion of the EIS process before the final decision is made.

### c. *Conclusion as to whether an SEIS was required*

Therefore, the plaintiffs have not raised serious questions going to the merits of whether the defendants were required to perform an SEIS. However, the plaintiffs have shown a likelihood of success on the merits in establishing that the defendants committed themselves to producing an SEIS even if they were not required to do so by law. Therefore, the Court finds that the plaintiffs have shown a probability of success that the defendants should have conducted an SEIS before approving this project.

#### 4. Whether the defendants properly considered indirect and cumulative effects

The federal regulations require the defendants to consider in an EIS "[i]mpacts, which may be: (1) Direct; (2) indirect; [and] (3) cumulative." 40 C.F.R. § 1508.25(c); *see also* 40 C.F.R. §§ 1502.16, 1508.8.[18] The plaintiffs argue that the defendants failed to evaluate indirect and cumulative effects. The defendants argue that they fully considered all indirect and cumulative effects.

Chapter Four of the FEIS discusses environmental consequences and mitigation measures made in the 710 Freeway Project. (AR 55:92–0572–92–0583 (FEIS).) Likewise, Chapter Eight discusses growth inducing impacts of the project. (AR 55:92–0646 (FEIS).) These chapters consider direct, indirect and cumulative effects on factors such as the human population, neighborhood character, community disruption, minority and specific interest groups, housing, employment and business, property values and tax base, community facilities, and growth. (AR 55:92–0572–92–0583; 55:92–0646 (FEIS).)

The Ninth Circuit recently held that when reviewing analysis of cumulative impact information, reliance on "very broad and general statements devoid of specific, reasoned conclusions" is improper. *Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F.3d 800 (9th Cir.1999).

Here, the defendants' analysis of growth inducing impacts is limited to one page which states, "The study area along the 710 is essentially fully built.... There is little opportunity for growth." (AR 55:92–0646.)

The Court is unable to conclude at this time whether the defendants provided sufficient detail and reasoning to support their conclusion that the 710 Freeway Project will have no significant growth inducing impacts. Accordingly, the Court is not in a position to decide whether the plaintiffs have raised serious questions on this issue. This issue can be addressed further on summary judgment.

#### C. Conclusion as to whether the defendants complied with NEPA

The plaintiffs have made four claims under NEPA: (1) the defendants failed to cure the non-concurrence of the EPA, the DOI, and the Advisory Council; (2) the defendants failed to evaluate the MMLB; (3) the defendants inappropriately failed to complete an SEIS; and (4) the defendants did not address indirect and cumulative effects. On the first and fourth claims, the plaintiffs have not met their initial burden. On the second and third claims, the plaintiffs have shown a likelihood of success on the merits.

### IV. Whether the defendants complied with the Clean Air Act

#### A. Legal standard

█ The standard of review for a challenge to agency action under the Clean Air Act ("CAA") is the same as that under

---

**18.** The regulations define "effects" to include:

 (a) Direct effects, which are caused by the action and occur at the same time and place.

 (b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

 Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

40 C.F.R. § 1508.8.

NEPA. *Conservation Law Found. v. Federal Highway Admin.*, 24 F.3d 1465, 1471 (1st Cir.1994). The Court "will reverse an agency's decision where it is contrary to procedures required by law or where it is arbitrary or capricious." *Marsh*, 52 F.3d at 1488 (internal quotations and citations omitted). The CAA "does not mandate particular substantive results, but instead imposes only procedural requirements." *Laguna Greenbelt*, 42 F.3d at 523.

## B. Discussion

The plaintiffs argue that the defendants violated the CAA in two respects: (1) that the project does not come from a conforming transportation improvement plan and (2) that the defendants' analysis of emissions is flawed. The defendants argue that they complied with all regulations in effect at the time the ROD was issued.

### 1. Whether the CAA applies to this project

The purpose of the CAA is to provide national standards on air pollution and to ensure that regional areas are in attainment of the national ambient air quality standards. 42 U.S.C. § 7506(d). The CAA provides that conformity requirements apply to "nonattainment areas." *Id.* § 7506(c)(5). The parties do not dispute that the South Coast Air Basin is a nonattainment area for ozone, nitrogen dioxide, particulate matter ("PM sub10")[19], and carbon monoxide ("CO"). *See* 40 C.F.R.

19. The regulations define PM sub10 as "particles with an aerodynamic diameter less than or equal to a nominal 10 micrometers." 40 C.F.R. § 50.7(a)(2).

20. The regulations require the FHWA to create long term transportation plans which will address "at least a twenty year planning horizon." 23 C.F.R. § 450.322(a). "The plan shall include both long-range and short-range strategies/actions that lead to the development of an integrated intermodal transportation system that facilitates the efficient movement of people and goods." *Id.* These plans are updated at least triennially in nonattainment areas such as the South Coast Air Basin. *Id.*

§ 81.305. This project is located in the South Coast Air Basin.

Therefore, the CAA's conformity requirements apply to this project.

### 2. Whether defendants properly met the CAA's conformity requirements

The regulations implementing the CAA state that all new projects "must come from a conforming plan and program." 40 C.F.R. § 93.115(a). To come from a conforming plan and program, the project must be "included in the conforming [Transportation Improvement Program ("TIP")]."[20] *Id.* § 93.115(c)(1). Additionally, the regulations specifically state that "FHWA/FTA projects must be found to conform before they are adopted, accepted, approved, or funded." *Id.* § 93.104(d).

The plaintiffs argue that the defendants violated the CAA by issuing the ROD before the 710 Freeway Project was found to conform in a TIP. The defendants argue that the project was included in a conforming TIP.

There are two TIPs at issue here. The first TIP covers actions taken between fiscal years 1996/97 and 2002/03 ("1996 TIP"). (AR 105:96–4754.) The second TIP covers actions taken between fiscal years 1998/99 and 2004/05 ("1998 TIP"). (Clinton Decl. at 932, 933A.) The FHWA determined on July 31, 1998 that the 1998 TIP conformed to the CAA's requirements. (*Id.* at 932.) This is the date that the 1998 TIP became effective. *See* 23 C.F.R. § 450.324.

Additionally, the regulations require state and public transportation operators to develop a TIP. 23 C.F.R. § 450.324(a). The TIP covers a period of at least three years and is updated at least every two years. *Id.* § 450.324(b), (d). In nonattainment areas, the FHWA and the FTA must make a conformity determination on any new or amended TIP. *Id.* § 450.324(b). The TIP must include all projects receiving federal funding and can only include projects that are consistent with the transportation plan for the region. *Id.* § 450.324(f), (g). Additionally, in nonattainment areas, all projects must be described with sufficient detail to allow for air quality analysis. *Id.* § 450.324(h).

The 1996 TIP discusses the 710 Freeway Project by stating, "DELETE: NO PROGRAM COMMITMENT." (AR 105:96–4915 (1996 TIP).)

The 1998 TIP appears to include the proposed project. (Decl. of Jan Chatten–Brown, Ex. 40 at 2 (1998 TIP).)[21] It lists the project as "Excluded prior to 10/01/98." The 1998 TIP describes the activities to be carried out on the 710 Freeway Project within the next three years as "repair and preservation of historic buildings" and "partial right of way" acquisition. (*Id.*)

### a. *Whether the project came from a conforming TIP*

■ The plaintiffs contend that the project did not come from a conforming program because it was not included in the 1996 TIP and the 1998 TIP did not exist at time the ROD was issued.

The state defendants argue that "the 1996 TIP conformity analysis, as well as the Regional Transportation Plan accounts for *all phases* of the I–710 Gap Closure project." (Caltrans Opp. at 21:4–6.) There is, however, no evidence in the 1996 TIP that the TIP considered the project in the modeling analysis. The 1996 TIP states the contrary—that the project was "deleted" from the conformity analysis. (AR 105:96–4915 (1996 TIP).)

The federal defendants do not argue that the 710 Freeway Project is included in the 1996 TIP. However, the federal defendants argue that the plaintiffs' claims are moot for two reasons: (1) the 1998 TIP supersedes the 1996 TIP and (2) the 1998 TIP includes all actions anticipated on the project during the relevant three-year time frame.

The regulations state: "FHWA/FTA projects must be found to conform *before* they are adopted, accepted, approved, or funded." 40 C.F.R. § 93.104(d) (emphasis added). For a project to be found to

conform it must be included in a conforming TIP. *Id.* § 93.115(c)(1).

The defendants issued the ROD on April 13, 1998. The only conforming TIP in effect at that time was the 1996 TIP. The 1998 TIP was not in effect at that time because it was not issued by SCAG until April 16, 1998 or found to be conforming by the FHWA and the FTA until July 31, 1998. (Clinton Decl. at 932, 933A.) Therefore, it does not appear that the project was found to be conforming before it was "adopted, accepted, approved, or funded." 40 C.F.R. § 93.115(c)(1).

The plaintiffs have made a strong showing of a probability of success on the merits that the 710 Freeway Project did not come from a conforming TIP and that the defendants did not comply with the conformity requirements of the CAA.

### b. *Whether the 1998 TIP properly addressed the air quality impacts of the 710 Freeway Project*

■ The plaintiffs argue that the 1998 TIP does not sufficiently address air quality impacts of the 710 Freeway Project because it limits analysis to actions anticipated during the next three years. The state defendants argue that the 1998 TIP properly addresses all phases of the project. The federal defendants assert that the 1998 TIP properly accounts for actions anticipated to be taken during the three years covered by the TIP.

The state defendants are incorrect. The 1998 TIP only includes actions for historic renovation and preservation and partial right-of-way acquisition. (Decl. of Jan Chatten–Brown, Ex. 40 at 2 (1998 TIP).) The TIP does not include impacts stemming from emissions resulting from the actual construction and operation of the freeway.

The question, therefore, is whether the CAA requires a TIP to address the air

---

21. The 1998 TIP was not included in the administrative record, presumably because it

did not exist at the time the ROD was issued.

quality impacts over a three-year period or over a longer period.

A TIP must include:

(A) a priority list of proposed federally supported projects and strategies to be carried out within each 3-year period after the initial adoption of the transportation improvement program; and

(B) a financial plan that—

(i) demonstrates how the transportation improvement program can be implemented;

(ii) indicates resources from public and private sources that are reasonably expected to be available to carry out the program;

(iii) identifies innovative financing techniques to finance projects, programs, and strategies; and

(iv) may include, for illustrative purposes, additional projects that would be included in the approved transportation improvement program if reasonable additional resources beyond those identified in the financial plan were available.

23 U.S.C. § 134(h)(2); *see also* 23 C.F.R. § 450.324(d). TIPs must be updated at least every two years. 23 C.F.R. § 450.324(b).

The defendants argue that these provisions limit the scope of activities that must be included in the TIP to those actually taking place within the TIP's three-year coverage period.

There are, however, other regulations which indicate that the TIP must consider the effects of air quality emissions not just for three years, but through the last year of the effective transportation plan—at least twenty years later. For example, the regulations state, "Consistency with the

motor vehicle emissions budget(s) must be demonstrated for each year for which the applicable (and/or submitted) implementation plan specifically establishes motor vehicle emissions budget(s), for the last year of the transportation plan's forecast period." 40 C.F.R. § 93.118(b). The regulations require that transportation plans address "at least a twenty year planning horizon." 23 C.F.R. § 450.322(a). Therefore, the TIP must consider the air quality impacts of any projects undertaken within the three-year time frame of the TIP for at least the next 20 years.

■ This later interpretation of the regulations appears to be consistent with the EPA's analysis of these regulations.[22] The EPA has stated that the 1993 regulations' "conformity rule requires the conformity of transportation plans and TIPs to be demonstrated for the entire 20-year timeframe of the transportation plan." 61 Fed.Reg. 36,112, 36,126 (1996). The 1993 conformity rule was reaffirmed by the EPA in 1997, and was in effect at the time the ROD was signed. 62 Fed.Reg. 43,780, 43,787 (1997). Additionally, "[c]onformity determinations are required to analyze entire projects rather than individual phases." 61 Fed.Reg. 36,112 36,124 (1996).

The EPA explained that "[a]ccording to the Clean Air Act, one of the purposes of conformity is to ensure that transportation improvements do not cause or contribute to new violations." 61 Fed.Reg. 36,112, 36,127 (1996). Additionally, the EPA accepted the analysis of some commentators that:

it is appropriate to analyze the effects of transportation investments over a 20-year timeframe, because it may in fact take decades for these effects to be fully

---

**22.** The EPA is the federal agency charged with the duty of promulgating regulations under the CAA. 42 U.S.C. § 7506(c)(4) (1994) (requiring the EPA to promulgate regulations). The courts must give great deference to the promulgating agency's interpretation of the regulations it was assigned to execute. *See Citizens for Clean Air v. United States*

*Envtl. Protection Agency,* 959 F.2d 839, 844 (9th Cir.1992); *Natural Resources Defense Council v. Thomas,* 805 F.2d 410, 439 (D.C.Cir.1986) (where "the EPA was able to adduce an equally reasonable interpretation of the law it was assigned to execute, we must defer to the agency.").

realized. They stated that it is better to use a long timeframe and make the right choices at the outset than to pursue a path for several years and then try to quickly overcome the adverse consequences of that path. One commenter pointed out that demonstrating conformity to the SIP's budget over the 20 years of the transportation plan is the best way to prepare for the fact that the benefits of fleet turnover do decline over time.

62 Fed.Reg. 43,780, 43,787 (1997). Further, the EPA stated:

Other commenters suggested that conformity should not be required until there are tools adequate to the task. EPA believes this is not consistent with the Clean Air Act's requirement to demonstrate that the transportation plan will not cause or worsen violations of air quality standards. Conformity of a transportation plan cannot be determined unless all years of the transportation plan are considered. EPA believes that adequate analytical tools are currently available and are continually being improved. All areas have great freedom to improve their own analysis techniques, which EPA supports.

*Id.* at 43,788.

The Court finds that the plaintiffs' and the EPA's arguments are reasonable and persuasive. The statutory scheme of 20 years is consistent with the long-term planning that must go into a project of this magnitude, which often takes 20 years or more to develop. It is consistent with the statutory scheme to consider air quality impacts during the early planning stage rather than three years before ground breaking, when tremendous resources have been invested. Placing a three-year limit on the conformity analysis contained in the TIP, as the defendants suggest, does not effectuate the CAA's goals of ensuring that "transportation improvements do not cause or contribute to new violations." 61 Fed.Reg. 36,112, 36,127 (1996).

The federal defendants admit that the 1998 TIP analyzes actions such as project design, preparation of environmental documents, and right-of-way acquisition. All parties agree that these actions will have no air quality impacts. However, the defendants have not considered the air quality impacts of this project 20 years into the future. Accepting the defendants' contention that the defendants will begin construction in 2010, there is a strong likelihood that there will be significant air quality impacts from construction of the project and possibly from operation of the freeway in the next twenty years. The defendants have not addressed these impacts. This appears to be a violation of the CAA's conformity requirements.

Therefore, the Court finds that the plaintiffs have raised serious questions going to the merits on this issue.

c. *Whether the design and scope of the project have changed significantly from those contained in the 1996 TIP*

The plaintiffs argue that the defendants violated the CAA because the design and scope of the project contained within the ROD are different from those listed in the 1996 TIP. The plaintiffs claim that there have been changes in the alignment of the Footprint and that additional cut-and-cover tunnels were added after the 1996 TIP was issued.

The regulations define "design concept" as "the type of facility identified by the project, e.g., freeway." 40 C.F.R. § 93.101. The regulations define "design scope" as "the design aspects which will affect the proposed facility's impact on regional emissions, usually as they relate to vehicle or person carrying capacity and control." *Id.*

The project continues to be a freeway. Therefore, the design concept has not changed. Likewise, shifts in the project's alignment and the additions of cut-and-cover tunnels are not changes that are generally considered part of a project's design scope. *See id.* (discussing number

of lanes, length of project, access control, number and location of intersections, and HOV lanes).

Therefore, the plaintiffs have not met their initial burden in showing that the project's design and scope are different from that contained in the 1996 TIP.

### 3. Whether the defendants properly analyzed emissions associated with the 710 Freeway Project

The plaintiffs argue that the CO and PM sub10 emissions hotspot analysis is flawed in three respects: (1) the defendants failed to analyze PM sub10 hotspots; (2) the defendants did not appropriately analyze CO hotspots; and (3) the defendants failed to undertake adequate interagency consultation.

### a. Whether the defendants failed to analyze PM sub10 hotspots [23]

The regulations require that the FHWA projects:

> must not cause or contribute to any new localized CO or PM sub10 violations or increase the frequency or severity of any existing CO or PM sub10 violations in CO and PM sub10 nonattainment and maintenance areas. This criterion is satisfied if it is demonstrated that no new local violations will be created and the severity or number of existing violations will not be increased as a result of the project.

40 C.F.R. § 93.116(a). The regulations provide specific methodologies for analyzing emission hotspots. *Id.* §§ 93.116(a), 93.123. For PM sub10 hotspots, the regulations state: "The hot-spot demonstration required by § 93.116 must be based on quantitative analysis methods." *Id.* § 93.123(b)(1). However, the quantitative analysis requirement will "not take effect until EPA releases modeling guidance on this subject and announces in the Federal

Register that these requirements are in effect." *Id.* § 93.123(b)(4). The EPA has not made such an announcement. The regulations also state, however, "Where quantitative analysis methods are not required, the demonstration required by § 93.116 may be based on a qualitative consideration of local factors." *Id.* § 93.123(b)(2).

The plaintiffs argue that the defendants violated the CAA because they undertook no PM sub10 hotspot analysis prior to approving this project. The defendants argue that they were not required to undertake this analysis because the EPA has not promulgated any regulations setting forth modeling guidance for local hotspots. The plaintiffs respond that the regulations require the defendants to undertake a qualitative analysis of local hotspots where a quantitative analysis is not required. *See id.*

The defendants' argument essentially is that 40 C.F.R. § 93.123(b)(4) creates an exemption to the requirement that they evaluate local PM sub10 hotspots until the EPA issues regulations effectuating that requirement. This gives the regulation an overly broad reading. Section 93.123(b)(4) only addresses the quantitative analysis requirement in § 93.123(b). It does not address the specific qualitative analysis or the analysis of localized PM sub10 hotspots generally. It never discusses § 93.116.

■ 40 C.F.R. § 93.116 specifically requires the FHWA to undertake an analysis of whether the project will create localized PM sub10 hotspots. The regulations define the methodology for this analysis in § 93.123(b). This section provides for two types of analyses—quantitative and qualitative. *Id.* § 93.123(b)(1), (2). It also states, however, that quantitative analysis is not in effect at this time. *Id.* § 93.123(b)(4). Qualitative analysis is an

---

**23.** The Court notes that on May 14, 1999, the D.C. Circuit invalidated EPA regulations establishing PM sub10 as the indicator for coarse particulate matter. *See American Trucking Ass'n, Inc. v. United States Envtl.* *Protection Agency,* 175 F.3d 1027 (D.C.Cir. 1999). The Court sets forth its reasoning on this issue in this section of the opinion in the event that *American Trucking* is modified on further review.

appropriate method for fulfilling the requirements under 40 C.F.R. § 93.116. *Id.* § 93.123(b)(2). Therefore, reading the regulations as a whole and in their most consistent light, the regulations require the FHWA to undertake a qualitative analysis of whether the 710 Freeway Project will create any localized PM sub10 hotspots regardless of whether the EPA has promulgated quantitative analysis modeling guidelines. *Id.* §§ 93.116(a); 93.123(b)(2).

There is no indication that the defendants conducted any analysis of localized PM sub10 hotspots. (*See* AR 96:96–1009 (Physical Environmental Report Supplement states that PM sub10 "hotspot analyses are not required for this project because the [EPA] has not released modeling guidance nor announced in the Federal Register that these requirements are in effect.").) Therefore, the plaintiffs have made a strong showing of the probability of succeeding on the merits of this claim.

b. *Whether the defendants properly analyzed CO hotspots*

■ The plaintiffs argue that the defendants improperly analyzed CO hotspots in two respects: (1) the defendants did not follow the EPA's guidelines in selecting the appropriate intersections for study and (2) the defendants did not use appropriate locations for the receptors used in the study.

i. *Whether the defendants selected the appropriate intersections for study*

The EPA has promulgated guidelines for modeling CO emissions from roadway intersections. (*See* AR 59:92–2312.) These guidelines state:

The following steps should be used for ranking and selecting intersections for modeling: 1) Rank the top 20 intersections by volumes; 2) Calculate the Level–of–Service (LOS) for the top 20 inter-

sections based on traffic volumes; 3) Rank these intersections by LOS; 4) Model the top 3 intersections based on the worst LOS; and 5) Model the top 3 intersections based on the highest traffic volumes.

(AR 59:92–2332.)

The plaintiffs argue that the defendants' CO hotspot analysis is insufficient because the defendants selected three intersections which they found to "represent the busiest intersections within the Route 710 transportation extension corridor." (AR 96:96–1007 (Physical Environmental Report Supplement).)[24] The plaintiffs argue that there is no indication whether these intersections had the worst LOS or the highest traffic volumes.

The defendants based their conformity finding on a document prepared by Caltrans entitled: "Air Quality Report for the proposed construction of the Long Beach (Route 710) Freeway Extension from the San Bernardino (Route 10) Freeway to the Foothill (Route 210) Freeway." (AR 85:95–0718 (Air Quality Report).) In this report, Caltrans states that it based its methodology on "A Dispersion Model for Predicting Air Pollutant Concentrations near Roadways" which is commonly referred to as "CALINE4." (AR 85:95–0727 (Air Quality Report).) The report states that "this model . . . is approved for use by both the EPA and the FHWA." (AR 85:95–0727 (Air Quality Report).)

The regulations state that "[f]or analyzing CO impacts at roadway intersections, users should follow the procedures in the 'Guideline for Modeling Carbon Monoxide from Roadway Intersections.'" 40 C.F.R. § 51, App. W at 6.2.2(a). However, "[i]n areas where the use of . . . CALINE4 has previously been established, its use may continue." *Id.*

---

24. The three intersections are: 1) Valley Boulevard/Fremont Avenue; 2) Huntington Drive/Los Robles Avenue; and 3) Arroyo Parkway/California Boulevard. (AR 96:96–1007 (Physical Environmental Report Supplement).)

It appears that this project is in an area where the use of CALINE4 has been established and approved of by the EPA. (AR 85:95–0727 (Air Quality Report).) The regulations state that this is an acceptable substitute for the EPA's model guidelines. 40 C.F.R. § 51, App. W at 6.2.2(a). Apparently, Caltrans used the CALINE4 model in determining which intersections to evaluate. (AR 85:95–0727 (Air Quality Report).) Therefore, the choice of the three intersections appears to have been consistent with the regulations' modeling requirements. The plaintiffs, therefore, have not met their initial burden on this part of their claim.

### ii. Whether the defendants placed receptors in appropriate locations

The EPA guidelines for measuring CO levels recommend that receptors be placed at locations near the intersection accessible to the public. (AR 59:92–2345.) The guidelines state, "At a minimum, receptors should be located near the corner and at mid-block for each approach and departure at the intersection.... In the case of long approaches, it is recommended that receptors be placed at 25 and 50 m[eters] from the intersection corner." (AR 59:92–2345.)

All parties agree that the receptors were placed about 100 feet from the intersection. The plaintiffs argue that this is too far from the intersection to get an accurate reading. In support of their position, the plaintiffs cite a document prepared by the Institute of Transportation Studies at the University of California, Davis entitled: "Transportation Project–Level Carbon Monoxide Protocol" ("Davis study") which recommends placing receptors between ten and twenty feet from intersections. (Decl. of Antonio Rossmann and Jan Chattan Brown, Ex. 37 at 490–91.)

The defendants are not bound by the Davis study. The recommended guidelines state that the receptors must be near the intersection. (AR 59:92–2345.) It is undisputed that 100 feet is within the 25 to 50 meter range suggested by these guide-lines. Therefore, Caltrans appears to have complied with the regulations in its conformity study.

For these reasons, the plaintiffs have not met their initial burden in showing that the defendants did not properly analyze CO hotspots.

### c. Whether the FHWA failed to undertake adequate interagency consultation

■ The CAA requires that the EPA "review and comment" upon "newly authorized Federal projects for construction." 42 U.S.C. § 7609(a)(2). The regulations state:

> State departments of transportation must provide reasonable opportunity for consultation with State air agencies, local air quality and transportation agencies, DOT, and EPA, including consultation on the issues described in paragraph (c)(1) of this section, before making conformity determinations.

40 C.F.R. § 93.105(a)(2). The regulations state that "Interagency consultation procedures shall include at a minimum ... A process for circulating (or providing ready access to) draft documents and supporting materials for comment before formal adoption or publication." Id. § 93.105(b)(2)(iii). Additionally, the regulations require: "A process involving the MPO, State and local air quality planning agencies, State and local transportation agencies, EPA, and DOT for ... Evaluating and choosing a model (or models) and associated methods and assumptions to be used in hot-spot analyses and regional emissions analyses." Id. § 93.105(c)(1)(i).

The plaintiffs argue that the defendants failed to provide adequate interagency consultation in that the defendants did not provide the EPA with the air quality reports prepared in 1995 and 1996 until those documents became final. The defendants argue that they provided all appropriate agencies with copies of these reports in January 1996. (AR 96:96–0965–96–0974.) The defendants state that they

accepted comments from these agencies for thirty days after receipt of these documents. (AR 96:96–0965–96–0974.)

It appears that the defendants did give the EPA and other agencies the "reasonable opportunity for consultation" that 40 C.F.R. § 93.105(a)(2) requires. The appropriate agencies were given copies of the air quality reports before the defendants found that the project conformed with the TIP. The commenting agencies had the opportunity to question the models chosen by the defendants, but there is no indication that the EPA or any other agency chose to question the models or the results. This appears to be a reasonable opportunity for comment.

Therefore, the plaintiffs have not met their initial burden in showing that the defendants failed to undertake the appropriate level of interagency consultation.

d. *Conclusion as to whether emissions analysis was proper*

The plaintiffs have shown a likelihood of success on the merits that the defendants did not properly evaluate PM sub10 hotspots. The plaintiffs have not met their initial burden in showing that the defendants did not properly analyze CO emissions or that the defendants failed to undertake the appropriate level of interagency consultation.

C. *Conclusion as to whether the defendants complied with the Clean Air Act*

The plaintiffs have made two claims under the CAA: (1) that the project does not come from a conforming TIP and (2) that the defendants' analysis of emissions is flawed. The plaintiffs have made a strong showing of a probability of success on the first and second claims regarding the analysis of PM sub10 hotspots. The plaintiffs have not met their initial burden under the second claim with regard to the analysis of CO hotspots and interagency consultation issues.

## V. Whether the equities favor granting a preliminary injunction

A. *Whether the plaintiffs have meet the appropriate standard for each of their claims to warrant a preliminary injunction*

1. *Whether the plaintiffs have established a possibility of irreparable injury*

The plaintiffs have shown a probability of success on the merits of their Section 4(f) claims that the defendants failed to properly evaluate the MMLB and that the defendants failed to consider properties that are eligible for listing on the California Register, but are not eligible for listing on the National Register.

The plaintiffs have shown a probability of success on the merits on their NEPA claims that the defendants failed to properly evaluate the MMLB and that the defendants failed to conduct an SEIS.

The plaintiffs have shown a probability of success on the merits on their CAA claims that the project does not come from a conforming TIP and that the defendants failed to analyze PM sub10 hotspots.

If the plaintiffs have demonstrated that there is a possibility of irreparable injury then a preliminary injunction is appropriate. *See International Jensen,* 4 F.3d at 822.

The plaintiffs argue that allowing the defendants to continue with right-of-way acquisition, project design and other actions before the Court determines whether the defendants have fulfilled their statutory obligations will irreparably injure the communities through which the 710 Freeway Project will pass—the El Sereno neighborhood in Los Angeles, South Pasadena, and western Pasadena.

 The Supreme Court has stated, "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore,

the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Although an injunction is not automatic whenever the court identifies a NEPA violation, the Ninth Circuit has recognized that an injunction is the appropriate remedy absent unusual circumstances. *Forest Conservation Council v. United States Forest Serv.,* 66 F.3d 1489, 1496 (9th Cir.1995); *see also Village of Gambell,* 480 U.S. at 545, 107 S.Ct. 1396; *Sierra Club v. Marsh,* 872 F.2d 497, 503–04 (1st Cir.1989).

The purpose of statutes such as Section 4(f), NEPA, and the CAA is to require decisionmakers, in a public forum, to consider the impacts a project will have on public health, safety, the environment, and historic and natural resources. The ROD, *inter alia,* is a statement that the government has met its obligations under the applicable statutes and regulations.

Where the government issues a ROD and has not complied with the applicable statutes and regulations there is a possibility of irreparable injury, except in unusual circumstances. Allowing the government to act upon a ROD where the government does not appear to have fully considered all environmental, public health and safety, and Section 4(f) resource consequences of a project is antithetical to the purpose and intent of these statutes and regulations.

The defendants concede that the 710 Freeway Project will have significant impacts on historic resources. There is the possibility that it will also have significant impacts on the environment in the west San Gabriel Valley and significant air quality impacts which have yet to be appropriately considered.

The Court finds that there is the possibility of irreparable injury in this case arising from what appear to be violations of NEPA, Section 4(f) and the CAA. Additionally, the Court finds that this case does not present the sort of unusual circumstances that counsel against the issuance of an injunction. Therefore, the Court finds that a preliminary injunction is appropriate.

2. *Whether the balance of equities tips sharply in the plaintiffs' favor*

The plaintiffs have raised serious questions going to the merits on their Section 4(f) claim that the defendants failed to properly consider constructive use impacts.

If the plaintiffs have demonstrated that the balance of the equities tips sharply in their favor then a preliminary injunction is appropriate. *See International Jensen,* 4 F.3d at 822.

The Los Angeles metropolitan area has some of the worst traffic problems in the country. The defendants argue that the 710 Freeway Project will alleviate some of these problems. In particular, this project will provide an additional north-south link between the San Bernardino Freeway (Interstate 10) and the Foothill Freeway (Interstate 210). The defendants argue that this link will relieve congestion in downtown Los Angeles and in the western San Gabriel Valley. They argue that the project will increase regional mobility, reduce traffic on local streets, improve traffic safety, and improve air quality. They also argue that this project will provide jobs.

Additionally, the defendants state that the City of Alhambra must spend significant funds because the current freeway terminus directs through traffic onto crowded city streets. They argue this project will reduce such expenditures.

The plaintiffs argue that the equities tip sharply toward granting preliminary injunctive relief during the pendency of this action. They argue that because of the immense scope of this project it will essentially destroy the City of South Pasadena, the El Sereno neighborhood in Los Angeles and portions of west Pasadena. The plaintiffs argue that the project will use significant historic resources in each of these communities and will adversely af-

fect the environment. They emphasize that by bisecting South Pasadena the project will destroy one of the most stable historic communities in the Los Angeles area.

The defendants respond that a preliminary injunction is not necessary because the ROD addresses the plaintiffs' concerns. The plaintiffs acknowledge that the ROD imposes limitations on what the defendants can and cannot do in the Corridor pending the final design and construction of the project. These limitations include limiting acquisitions to "hardship or protective purchases," requiring Caltrans to maintain property it owns unless the condition of the property requires removal, and adopting interim improvement measures similar to those described in the MMLB. (AR 129:98–1874–98–1876(ROD).)

The plaintiffs urge that these measures are insufficient for three reasons. First, the ROD imposes limitations on federal expenditures, but does not limit state expenditures. State agencies are not covered by the ROD's limitations. Caltrans has not committed to abiding by these limitations. Caltrans could use state funds to purchase properties or make other changes in the Corridor that are not anticipated by the ROD.

Second, the plaintiffs argue that the limitations in the ROD are insufficient because they allow Caltrans to remove, rather than repair, structures that have deteriorated. The plaintiffs argue that removing structures results in a *de facto* destruction of the affected communities. The plaintiffs emphasize that the deterioration of these structures was caused by Caltrans's neglect over the years.

Finally, the plaintiffs argue that the ROD allows the defendants to commit significant resources to the 710 Freeway Project before completion of the necessary studies.

Congress stated the national public interest requires the FHWA to properly perform the required studies before decisions are made. "An administrative agency's failure to comply with the law 'invokes a public interest of the highest order: the interest in having government officials act in accordance with the law.'" *Hells Canyon Preservation Council v. Jacoby*, 9 F.Supp.2d 1216, 1245 (D.Or.1998), *quoting, Seattle Audubon Soc. v. Evans*, 771 F.Supp. 1081, 1096 (W.D.Wash.), *aff'd*, 952 F.2d 297 (9th Cir.1991). The plaintiffs have made a showing that the defendants did not act in accordance with the law.

The Court finds the plaintiffs' concerns persuasive. The Court finds that the plaintiffs have demonstrated that the balance of the equities tips sharply toward the plaintiffs. The plaintiffs have made a strong showing that the defendants did not comply with the statutory obligations under Section 4(f) and NEPA. A preliminary injunction is appropriate.

## VI. Scope of the preliminary injunction

The plaintiffs have requested the following preliminary injunctive relief:

1. Prohibit the expenditure of federal or state funds to construct any portion of the 710 Freeway Project, without leave of Court;

2. Prohibit the expenditure of federal or state funds to allow any acquisitions of properties for the proposed 710 Freeway Project, without leave of Court;

3. Require the state defendants to repair all state-owned properties (including receiving approval from the State Historic Preservation Officer for modification to any historic properties of national, state, or local significance) in accordance with a timetable submitted to the Court;

4. Require the state defendants to rent state-owned properties for occupancy and use;

5. Require the state defendants to report to the plaintiffs and to the Court semi-annually on the condition of all state-owned properties within the Corridor;

6. Prohibit the expenditure of federal or state funds for further freeway design and engineering, except for planning measures necessary to comply with the NEPA, Section 4(f), and other federal and state mandates, and except for design and implementation of "interim" transportation improvements within the Corridor, as approved by the Court; and

7. Require that any party seeking leave of Court for relief from the injunction give the other parties 60 days' notice of such application.

(Mot. 43:11–26; Proposed Preliminary Injunction 4:13–5:15.)

The defendants assert that the plaintiffs' requests are intrusive and would in essence make this Court a "project manager." Additionally, the defendants argue that many of the plaintiffs' requests are unnecessary because the ROD already contains several of the conditions that the plaintiffs are seeking. For example, the ROD places limitations on the defendants' ability to acquire new properties in the Corridor and mandates that Caltrans maintain state-owned properties in good repair. (AR 129:98–1874–98–1875(ROD).)

The plaintiffs respond that the conditions contained in the ROD are insufficient. The plaintiffs argue that the ROD governs only the use of federal funds and does not restrict the use of state funds. Additionally, the plaintiffs assert that the ROD does not contain an enforcement mechanism should the defendants violate the ROD's limitations. The plaintiffs assert that because of Caltrans's record of noncompliance with the 1973 injunction the Court should issue an injunction that will provide the plaintiffs relief in the event that Caltrans violates the limitations set forth in the ROD.[25]

The Court will address each of the plaintiffs' requests.

A. *Whether to prohibit the expenditure of federal or state funds to construct any portion of the 710 Freeway Project, without leave of Court*

The purposes of the ROD are to allow the defendants to finalize the design of the 710 Freeway Project, to allow the acquisition of a right-of-way, and to authorize construction. The Court has found that the plaintiffs have made a substantial showing that the defendants failed to comply with statutory requirements. Therefore, the Court finds that it is appropriate to enjoin the defendants from spending either federal or state funds to construct any portion of the 710 Freeway Project without leave of Court.

The Court notes, however, that this restriction applies only to physical freeway construction. The parties should not construe this to be a limitation on the interim non-freeway improvement measures discussed in the ROD. (AR 129:98–1876(ROD).)

B. *Whether to prohibit the expenditure of federal or state funds to allow any acquisitions of properties for the proposed 710 Freeway Project, without leave of Court*

The ROD limits the defendants' ability to acquire properties in the Corridor to hardship or protective purchases until the defendants complete the SEIS, among other things. (AR 129:98–1874(ROD).) The defendants argue that this limitation in the ROD is sufficient to protect the affected communities in the Corridor. The plaintiffs argue that the ROD contains no enforcement mechanism and only restricts the expenditure of federal funds. The plaintiffs argue that an injunction is neces-

---

**25.** The Court notes that Caltrans "acknowledges prior issues relating to its management of properties it owns in the I–710 corridor." (State defendants' opp. at 26 n.7.) Caltrans, however, argues that "those issues have been addressed." (*Id.* (citing a FHWA report finding that Caltrans has "created a comprehensive commitment to maintain all obligations of public stewardship and, in addition, satisfied all criticism leveled at Caltrans' handling of ROW parcels." (Decl. of Rossmann and Chatten–Brown, Ex. 5 at 103 ¶ VII.)))

sary to prevent the state defendants from acquiring properties in the Corridor.

The defendants have imposed certain conditions upon themselves in the ROD. As stated above, the ROD limits purchases to those constituting hardship acquisitions or protective purchases. This limitation is binding on all defendants as a part of the NEPA process. *See Tyler*, 136 F.3d at 608.

The plaintiffs argue that this limitation is inadequate because the state defendants have disregarded similar language in the prior injunction by purchasing numerous properties in the Corridor. The Court does not find that it is necessary to prohibit the defendants from making appropriate hardship or protective purchases in accordance with the ROD's terms.

The Court, however, concludes that the state defendants should not be permitted to use state funds where the ROD prohibits the use of federal funds. The defendants should be enjoined from using state or federal funds to acquire properties in the Corridor unless they are hardship acquisitions or protective purchases.

C. *Whether to require the state defendants to repair all state-owned properties (including receiving approval from the State Historic Preservation Officer for modification to any historic properties of national, state, or local significance) in accordance with a timetable submitted to the Court*

The ROD states, "Property currently owned by Caltrans potentially needed for construction will be properly maintained until such time it is needed for construction or unless the condition of the property requires removal of the structure." (AR 129:98–1872(ROD).)

The plaintiffs request that the Court order the defendants to repair all state-owned properties in the Corridor. The defendants argue that they are already making appropriate repairs where feasible. However, the defendants argue that there are structures in disrepair to the extent that repairing them would be a waste of funds. The defendants argue that they should be entitled to demolish such structures. The plaintiffs respond that most of the structures that the defendants seek to demolish have been owned and neglected by the state for many years. Therefore, the plaintiffs argue that the defendants should not be permitted to benefit from their failure to abide by a court order.

The Court must balance all of the interests in determining what relief is warranted. The Court finds that the deterioration of the state-owned properties is due, at least in part, to the inactions of the defendants.[26] A party should not benefit from its failure to abide by a court order. However, the Court notes that the plaintiffs apparently did not seek a prompt judicial remedy for the defendants' violations of the earlier injunction. Therefore, the Court finds that while it is a serious matter to violate a court order, the equities are such that it would not be appropriate to obligate the defendants to spend public funds in a manner that would constitute waste.

The assumption in the preceding paragraph is that none of the structures qualifying for demolition are listed on or eligible for listing on either the California or national historic registries. As to any such properties, the defendants should be enjoined from demolishing them without prior Court approval. The Court further finds that the defendants should consult with the State Historic Preservation Officer before repairs are made to a property listed on or eligible for listing on the California or national historic registries to ensure that the repairs will not affect eligibility for registration.

---

**26.** The FHWA conducted a report investigating allegations of discrimination in a related case pending before Judge Marshall of this Court. The FHWA stated, "Most residential properties owned by Caltrans in the SR 710 corridor have experienced some degree of deterioration since they were acquired many years ago." (Decl. of Rossmann and Chatten–Brown, Ex. 5, p. 96.)

**D. Whether to require the state defendants to rent state-owned properties for occupancy and use**

The plaintiffs seek to have the defendants rent state-owned properties for occupancy and use. The defendants argue that this obligation is unnecessary and could potentially involve this Court in landlord-tenant disputes.

The Court has ordered the defendants to maintain state-owned structures in the Corridor. Renting these units for occupancy and use may be the most efficient method of ensuring that these structures are maintained in accordance with community standards and protected from vandalism. However, given the previous order that the defendants maintain the properties, the Court finds that the most efficient method of complying with that order should be left on a property-by-property basis to the discretion of the defendants.

**E. Whether to require the state defendants to report to the plaintiffs and to the Court semi-annually on the condition of all state-owned properties within the Corridor**

The Court finds that requiring the state defendants to report to the plaintiffs and to the Court semi-annually on the condition of all state-owned properties within the Corridor is a reasonable method of informing the Court regarding the status of the properties within the scope of this order.

**F. Whether to prohibit the expenditure of federal or state funds for further freeway design and engineering, except for planning measures necessary to comply with the NEPA, Section 4(f), and other federal and state mandates, and except for design and implementation of "interim" transportation improvements within the Corridor, as approved by the Court**

This request is premised on the plaintiffs' "bureaucratic momentum" argument, i.e. if the defendants invest substantial time and resources in this project they will become committed to it regardless of the merits of the project.

The Court has preliminarily found that defendants approved a ROD without complying with the relevant statutory framework. The defendants may not proceed with any actions in furtherance of the 710 Freeway Project a prerequisite of which was the issuance of a valid ROD. Conversely, nothing in this order prohibits the defendants from anything which is not dependent upon the issuance of a valid ROD.

The regulations, however, provide that "final design activities" shall not proceed until "a record of decision has been signed." 23 C.F.R. § 771.113(a)(1)(iii). The plaintiffs argue that the Court should enjoin final design activities because these activities are dependent on the signing of a valid ROD. The defendants argue that this sort of economic damage is not typically enjoined and the Court should not do so here. Additionally, the defendants note that there is no prohibition from spending state funds on final design work before the issuance of a valid ROD.

The Court finds that the plaintiffs have not demonstrated a sufficient need to enjoin these activities. These purely economic expenditures do not have the threat of affecting the environment or injuring Section 4(f) properties in the Corridor during the pendency of this action. Accordingly, the Court denies the plaintiffs' request for an injunction of these activities.

**G. Whether to require that any party seeking leave of Court for relief from the injunction give the other parties 60 days' notice of such application**

The Court declines to alter the normal notice period for motions. However, upon proper application, the Court will consider

modifying its normal briefing schedule on a motion-by-motion basis.

The plaintiffs also request that the defendants provide 60 days advance notice of their intent to demolish or acquire a property under the terms of this injunction. The defendants argue that this notice is not necessary and that notice for hardship acquisitions will violate the right to privacy of the individuals seeking to sell their homes under the hardship provision.

With regard to hardship acquisitions, the Court notes that disclosing details of potential hardship acquisitions may require that certain private information be released to the public. Counterbalancing this concern, however, is the plaintiffs' need to have access to information that will allow them to enforce the terms of the injunction. The Court finds that information about the number of hardship and protective purchases made will give the plaintiffs sufficient information to ensure that the defendants are complying with the terms of the injunction. If the quantity of acquisitions appears questionable, then the plaintiffs may seek further relief from this Court. Accordingly, the Court finds that when the defendants decide to make a hardship or protective purchase then they shall notify the plaintiffs of that fact within five days of entering any agreement to make a hardship acquisition or protective purchase.

The issue of demolition of state-owned properties within the Corridor, however, does not implicate the same privacy concerns. Accordingly, the Court finds that 60 days notice of the intent to demolish a state-owned structure within the Corridor is appropriate.

### VII. Whether the plaintiffs must post a substantial undertaking

The state defendants request that the Court require that the plaintiffs post a substantial undertaking should the Court issue a preliminary injunction. The federal defendants have not joined in this request.

 The Federal Rules of Civil Procedure grant the courts discretion to require an appropriate bond before a preliminary injunction may issue. Fed.R.Civ.P. 65(c). Courts routinely impose either no bond or a minimal bond in public interest environmental cases. *People ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir.), *modified on other grounds*, 775 F.2d 998 (9th Cir.1985). "The court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review." *Id., citing Friends of the Earth v. Brinegar*, 518 F.2d 322, 323 (9th Cir.1975); *Natural Resources Defense Council v. Morton*, 337 F.Supp. 167 (D.D.C.1971).

The Court finds that there is no basis to depart from this general rule. The Court declines to require a bond.

### CONCLUSION

IT IS HEREBY ORDERED that defendants Rodney E. Slater, Secretary of Transportation, Kenneth R. Wykle, Federal Highway Administrator, the Federal Highway Administration, Jose Medina, Director, California Department of Transportation and the California Department of Transportation, and each of them, as well as those acting in concert with or on behalf of the defendants, are hereby enjoined, pending final determination of the merits of the plaintiffs' Complaint, as follows:

1. Defendants are prohibited from expending federal or state funds to construct any portion of the 710 Freeway Project, without leave of Court;

2. Defendants are prohibited from expending federal or state funds to allow any acquisitions of properties for the proposed 710 Freeway Project, except for the acquisition of hardship properties or protective purchases, without leave of Court;

3. Defendants shall provide plaintiffs with notice within five days of entering into any agreement to make a hardship acquisition or protective purchase under the hardship acquisition or protective purchase exceptions set forth in paragraph 2;

4. State defendants are ordered to maintain all state-owned properties acquired for the 710 Freeway Project in conditions of good repair according to a timetable submitted to the Court within ninety (90) days from the issuance of this order, unless the condition of the property is such that repair of the property would constitute waste;

5. Defendants shall provide 60 days' advance notice to plaintiffs of defendants' intent to demolish or substantially alter properties under the waste exception set forth in paragraph 4 above (except in case of emergency, in which case defendants shall provide immediate notice to plaintiffs and afford plaintiffs a reasonable opportunity to inspect the property and circumstances) prior to such demolition or substantial alteration;

6. State defendants are ordered to receive approval of the State Historic Preservation Officer for repair or modification to state-owned properties in the Corridor, which are listed or eligible for listing on the National or California Historic Registers; and

7. State defendants must report to the Court and the plaintiffs semi-annually, commencing within ninety (90) days from the issuance of this order, on the condition and progress of maintenance and rehabilitation of all state-owned properties within the Corridor.

IT IS SO ORDERED.